## WRIGHT, comptroller-general, *v.* UNION TANK LINE CO.

1. This was a suit by an equipment company against the comptroller-general of the State, to enjoin the levy (under the Civil Code, § 990) of an ad valorem tax on cars of the company which were allowed to be moved, in the regular course of business, on the lines of railroad track in this State. It was alleged that the method proposed by the comptroller-general, if carried into effect, would impose a tax on property outside the State. The case was tried upon an agreed statement of facts. *Held,* that while some of the expressions used in the agreed statement of facts, if taken alone and disassociated from the context, might have the appearance of conceding that the comptroller-general was seeking to tax property outside of the State, yet, when taken as a whole and in connection with the allegations of the petition, it is evident that the parties did not intend any such concession.

2. Civil Code § 990 is to be construed in connection with Civil Code §§ 1031 and 989, which, by reference, are made parts thereof. So construed, provision is made for a method of taxing cars of equipment companies, moved on the lines of railroads in this State, on the track-mileage basis of apportionment. The method so employed does not contemplate taxation of property outside of the State, and is not violative of the due-process clause of the Federal or the State constitution.

3. The agreed statement of facts in this case shows the following: The Union Tank Line Company is incorporated in the State of New Jersey. It has offices in New York. It rents tank-cars to the Standard Oil Company, a Kentucky corporation. The agreements and settlements are made outside of this State. The cars are furnished for use by the Standard Oil Company. The railroad companies, in lieu of providing tank-cars, pay to the Union Tank Line Company three fourths of a cent per mile for each mile the car is moved over its tracks. The Standard Oil Company transports a large amount of oil to Jacksonville, Florida, and Savannah, Georgia, mainly by marine transportation. From these points oil is sent out, mainly by means of tank-cars, to different points in the interior. A number of these cars come into Georgia and are used there and elsewhere. *Held*, that this does not authorize the imposition upon the Union Tank Line Company of a franchise tax in addition to the tax upon its tangible property in this State, the value of which is arrived at by the rule indicated in the preceding headnote.

JULY 13, 1915. ON REHEARING, AUGUST 14, 1915.

Equitable petition. Before Judge Bell. Fulton superior court. August 28, 1914.

The Union Tank Line Company, a New Jersey corporation, was engaged in the business of renting out tank-cars to be employed in transporting oil and other like fluids over railroads throughout the United States. It had no office or agent in Georgia; nor did it have any property or do any business in Georgia, except by permitting its cars to be brought into and carried out of the State, and used, while in the State, by those having them for the time being. The contracts for the rental of the cars were made beyond the limits of the State, and the tank company also received its remuneration for the rent of its cars at its office outside of the State. In addition to the rents which it received from its customers (shippers of oil), it received, from the several railroads over which its cars were moved, a stated sum per mile for each mile that the cars were moved while on the several lines of the respective railroads. Under a contract of rental, executed outside of the State, different cars were supplied to one of its customers from time to time, which passed in and out of the State, and between intermediate points in the State, in the movement of oil in the regular course of business. The officers of the tank company wrote to the comptroller-general, asking for a form of tax returns "required to be made by equipment companies under section 990, Code Georgia." No forms had ever been prepared for equipment companies, and the comptroller-general forwarded forms prepared for express companies, explaining certain alterations to be made. After some correspondence, the

tank company made a return for the year 1913. The prepared return contained, among other things, the following:

"Value of all Real Estate Owned by Company in or out of Georgia: $———— None.

Total value of Sleeping or Palace Cars and all other Cars and Equipments, and all other Personal Property:  $10,518,333.16.

Total Number of Miles R. R. Lines over which Sleeping Cars are Run: 251,999.

Number of Miles of R. R. Lines in Georgia over which Sleeping Cars are Run:  6976½.

Value Franchise: $———— No Franchise.

Total Value of Property Taxable in Georgia:  $47,310.00.

Union Tank Line had an average of 57 tank-cars in Georgia during 1913, in which, at a value of $830.00 per capita, equals:  $47,310.00."

Acknowledging receipt of this return, the comptroller-general, on March 16, 1914, wrote to the officers of the company as follows:

"I acknowledge receipt of your letter of March 12th, together with the enclosure of the 1914 return as for the year ending December 31, 1913, but the return is for taxation this year, though the mileage figures of course have to be based on the previous year's business. Returns should, of course, be made for back years, as this is the first year your company has ever made a return for taxation. Unfortunately our courts have held that back taxes can be collected for only seven years, 1907, 1908, 1909, 1910, 1911, 1912, and 1913. Special blanks are now being prepared for equipment companies, and I will mail you a supply for the years mentioned within the next few days,—just as soon as they are received from the printer.

"As to the return filed, you have furnished the data desired, but have made an error in the application of same. After giving the mileage for the company everywhere and for Georgia, you then go ahead and assign 57 tank-cars for this State and value them at $830 each, making the total for Georgia $47,310.00. This is an incorrect method. If you were to be allowed to assign so many cars to the State for taxation, there would be no need for the mileage figures to be furnished. The value to be assigned to Georgia must be in the same proportion to the entire valuation for the entire company as the mileage in Georgia bears to the entire mileage everywhere. Thus: 251,999 : 6,976.5 : : $10,518,333 : ? The $10,518,333 multiplied by 6.976.5 gives 73,381,150,174.5, which divided by 251,999 gives $291,196, the proper valuation to be assigned to Georgia. Or, to work it out by percentage instead of

proportion, 6.976.5, the Georgia mileage, is 2.76846 per cent. of 251,999, the entire mileage. Georgia is therefore entitled to 2.76846 per cent. of the entire valuation. This per cent. of $10,518,333 is $291,195.84, or the same sum arrived at by proportion, if we call the 84 cents an even dollar. Unless decimals are extended almost indefinitely, there is, of course, always this slight difference.

"The correct valuation for Georgia of your physical property is therefore, $291,196, under the return you have made. A franchise value should also be returned. And whatever the value you place on the franchise for the entire country, 2.76846 per cent. of the same must be assigned for Georgia. Thus, if you value your franchise at $1,000,000, the franchise value assigned to Georgia would be $27,685. Please let me hear from you in regard to the franchise. The returns for the seven years back you need not bother with until you receive the blanks mentioned in the foregoing."

Nothing further having been heard by the comptroller-general from the company, on April 7th, 1914, he assessed the physical property of the company at $291,196 and franchise at $27,685, the franchise being doubled as prescribed in section 8 of the act of 1902 (Civil Code, § 1029), making the total valuation for each of the years 1907-1914, inclusive, $346,566. On the same day the comptroller-general informed the tank company, by letter, of the assessment. The letter also contained the following: "Under the law you have twenty days from this date in which to decide whether to accept this valuation or submit to arbitration the question of the value of your company's property. Unless within twenty days you notify me of your intention to arbitrate, and also furnish me with the name of your arbitrator, the assessments will stand." The company acknowledged receipt of the letter, and considerable correspondence ensued; but it did not offer to arbitrate. After the time for arbitration was over, the company, by its attorney, on May 26, 1914, offered to make returns for the years 1907 to 1912, inclusive, similar to that tendered for the year 1913, hereinbefore set out, except that there was a variance as to values. These returns were also rejected. After this the tank company instituted an action for injunction to prevent the levy and collection of the taxes as contended for by the comptroller-general. The court refused to dismiss the petition on general demurrer. By consent the trial proceeded before the judge, under an agreed statement of

facts, without the intervention of a jury. A judgment was rendered for the plaintiff, and the defendant excepted.

*Warren Grice, attorney-general,* for plaintiff in error.

*King & Spalding* and *Campbell, Harding & Pratt, contra.*

ATKINSON, J. 1. From what has been said, it is to be observed that the case relates to two matters, namely: a tax assessment against tangible property of the company; and second, a claim of right to assess a franchise tax. We will consider each in the order named above. While some of the expressions used in the agreed statement of facts, if taken alone and disassociated from the context, might have the appearance of conceding that the comptroller-general was seeking to tax property outside of the State, yet, when taken as a whole, it is evident that the parties did not intend any such concession. The effort was to tax property in this State, and in doing so to apply the statute designed as a rule to ascertain the property so coming into the State and its proper valuation. The correspondence between the officers of the tank company and the comptroller-general, set out in the statement of facts, formed a part of the petition for injunction, which is to be taken most strongly against the plaintiff. It referred in express terms to Civil Code § 990, and showed that both parties contemplated that the return which the comptroller-general was insisting upon was such as should be made under the requirement of the statute. It was contended by the plaintiff that the effect of carrying out the scheme of the statute would tax property out of the State. The comptroller-general denied that such would be the effect, and proposed only to tax cars in pursuance of the statute. The attack made by the plaintiff, being upon this method of taxing, resolved itself merely into an attack upon the constitutionality of the statute. Whether it was unconstitutional was a question of construction and of law, which the parties would not yield in the pleadings or in the statement of facts. A construction of the latter as a concession by the comptroller-general that he was attempting to tax cars that had not come into the State would make the comptroller-general assume a right to do a thing for which he had never contended, and be outside of the real issue—the constitutionality of the scheme of the statute.

2. In determining as to the constitutionality of the scheme of the statute referred to, resort must be had to its provisions. The

49

statute is embodied in the Civil Code, § 990, which is as follows: "Any person or persons, copartnership, company or corporation wherever organized or incorporated, whose principal business is furnishing or leasing any kind of railroad cars except dining, buffet, chair, parlor, palace, or sleeping-cars, or in whom the legal title in any such cars is vested, but which are operated, or leased, or hired to be operated on any railroads in this State, shall be deemed an equipment company. Every such company shall be required to make returns to the comptroller-general under the same laws of force in reference to the rolling-stock owned by the railroads making returns in this State, and the assessment of taxes thereon shall be levied and the taxes collected in the same manner as provided in the case of sleeping-cars in section 989." The last sentence of the foregoing excerpt, by referring thereto, makes as a part of the statute the laws "of force" in this State "in reference to the rolling stock owned by the railroads making returns in this State." In the same manner it makes Civil Code § 989 a part of the statute. The only law which refers to taxation of "rolling-stock" of railroads paying taxes in this State is embodied in Civil Code § 1031, and is evidently the law on that subject referred to in section 990. Section 1031 is as follows: "Railroad companies operating railroads lying partly in this State and partly in other States shall be taxed as to the rolling-stock thereof and other personal property appurtenant thereto, and which is not permanently located in any of the States through which said railroads pass, on so much of the whole value of rolling-stock and personal property as is proportional to the length of the railroad in this State, without regard to the location of the head office of such railroad companies." The other section (989) referred to in section 990 is as follows: "Each non-resident person or company whose sleeping-cars are run in this State shall be taxed as follows: Ascertain the whole number of miles of railroad over which such sleeping-cars are run, and ascertain the entire value of all sleeping-cars of such person or company, then tax such sleeping-cars at the regular tax rate imposed upon the property of this State in the same proportion to the entire value of such sleeping-cars that the length of lines in this State over which such cars are run bears to the length of lines of all railroads over which such sleeping-cars run. The returns shall be made to the comptroller-general by the president, general agent,

or person in control of such cars in this State. The comptroller-general shall frame such questions as will elicit the information sought, and answers thereto shall be made under oath. If the officers above referred to in the control of said sleeping-cars shall fail or refuse to answer, under oath, the questions so propounded, the comptroller-general shall obtain the information from such sources as he may, and he shall assess a double tax on such sleeping-cars. If the taxes herein provided for are not paid, the comptroller-general shall issue executions against the owners of such cars, which may be levied by the sheriff of any county of this State upon the sleeping-car or cars of the owner who has failed to pay the taxes."

The several code sections embody the statutory scheme for taxing cars of equipment companies whose cars are handled over the railroads in this State. Owing to the nature of the business, it is difficult to ascertain the number of cars of equipment companies that come into this State and designate the identity of each car or its value. The purpose of the statute is to provide a reasonable method for determining the fact that cars come into this State and the values thereof, to the end that the equipment companies allowing their cars to come into this State may bear their just proportion of taxes leviable in this State. The scheme of the statute is what is sometimes called the track-mileage basis of apportionment, or what in a more general way is termed the unit rule. The comptroller-general followed the statute. The unit rule has been upheld by the Supreme Court of the United States, in regard to railroads, telegraph companies, and sleeping-car companies. Kentucky Railroad Tax Cases, 115 U. S. 321 (6 Sup. Ct. 57, 29 L. ed. 414); Western Union Telegraph Co. v. Massachusetts, 125 U. S. 530 (8 Sup. Ct. 961, 31 L. ed. 790); Pullman's Palace Car Co. v. Pennsylvania, 141 U. S. 18 (11 Sup. Ct. 876, 35 L. ed. 613). And this principle of average has been approved in regard to refrigerator-cars. American Refrigerator Transit Co. v. Hall, 174 U. S. 70 (19 Sup. Ct. 599, 43 L. ed. 899); Union Refrigerator Transit Co. v. Lynch, 177 U. S. 149 (20 Sup. Ct. 631, 44 L. ed. 708). It has even been held that the unit rule of valuation could properly be applied to the valuation of property of express companies within a certain State, though there was no physical connection with property beyond the State. On this subject the Supreme Court of the

United States was divided as to the applicability of the rule to ex-
press companies, but the majority held that it was applicable.
Adams Express Co. *v.* Ohio State Auditor, 165 U. S. 194 (17 Sup.
Ct. 305, 41 L. ed. 683) ; Adams Express Co. *v.* Kentucky, 166
U. S. 171 (17 Sup. Ct. 527, 41 L. ed. 960). While in some of the
decisions of that court it has been said that special circumstances
might exist which would require a modification of the rule, such as
the existence of "terminal facilities of an enormous value" in one
State and not in another, yet, in the opinion of the Chief Justice in
Adams Express Co. *v.* Ohio State Auditor, supra, which was con-
curred in by a majority of the court, it was said (165 U. S. 227) :
"Special circumstances might exist, as indicated in Pittsburgh,
Cincinnati etc. Railway *v.* Backus, 154 U. S. 421, 443 [14 Sup. Ct.
1114, 38 L. ed. 1031], which would require the value of a portion
of the property of an express company to be deducted from the
value of its plant as expressed by the sum total of its stock and
bonds, before any valuation of mileage could be properly arrived
at; but the difficulty in the cases at bar is that there is no showing
of any such separate and distinct property which should be deducted,
and its existence is not to be assumed. It is for the companies to
present any special circumstances which may exist, and, failing
their doing so, the presumption is that all their property is directly
devoted to their business, which being so, a fair distribution of its
aggregate value would be upon the mileage basis." We deem it
proper to follow the decision of the majority. In the case before
us there is no contention that the tank company owns any terminals
of great value outside of the State of Georgia, or any real estate so
located, or that there is any property which is not employed in the
business. The provision in section 1031, supra, that such company
shall be taxed as to cars "thereof and other personal property ap-
purtenant thereto, and which is not permanently located in any of
the States through which said railroads pass," negatives the intent
to tax cars which do not come into this State. Any one of the
cars of the company might be brought into Georgia as required.
These cars are not like wagons or automobiles, disconnected from
a railroad, which may be carried to any point about the country.
They necessarily travel over the tracks of railroads. One car may
be called into service in this State as well as another. The com-
pany has an arrangement with railroads in this State to charge

them mileage for the use of their cars in hauling them over their tracks. It seems to us, therefore, that the case falls within the rule laid down by the Supreme Court of the United States, as above mentioned, and that there are no such circumstances as to bring it within the ruling made in Fargo v. Hart, 193 U. S. 490 (24 Sup. Ct. 498, 48 L. ed. 761), where it was held that "A State assessment upon an express company of another State, proportioned to mileage, is bad when it appears that the total valuation is made up principally from real and personal property, not necessarily used in the actual business of the company, and which is permanently located in the State where the company is incorporated." It will be seen that the facts in that case are quite different from the one under consideration. If the unit rule can never be applied where the company has assets in more than one State, and where there is an inequality in the amount of such assets in proportion to mileage in the respective States, the rule might as well be declared abolished at once; because practically all large companies doing business in different States have a considerably larger amount of assets in one State than in another. It rarely, if ever, occurs that there is anything like an exact proportion between assets and mileage in the respective States where business is done. So that, to announce that the mileage rule is sound, and then to modify it to the extent of saying that it does not apply, or must be changed, whenever the company shows a disproportion of assets used in the business in different States, will in most cases be equivalent to abolishing it as a rule and making it a mere circumstance for consideration by the assessing authorities.

Our statutes provide ample means for attacking the validity of a tax, or for arbitrating the valuation placed upon property by the comptroller-general. Civil Code, §§ 1045-1046, 1050-1054. Nor does the law providing for such an assessment of property of certain character, in order to determine its value, contravene the provision of the State constitution requiring taxes upon property to be uniform and ad valorem. *Columbus Southern Railway Co.* v. *Wright,* 89 *Ga.* 574 (15 S. E. 293).

3. Under the agreed statement of facts we do not think that the tank company is exercising any franchise in the State of Georgia which is taxable as such, as distinguished from the consideration of the unit or mileage rule in fixing the value of the property

within the State. It was agreed that the company had no agency in Georgia, conducted no business here, and exercised no franchise here, unless it did so under the following agreed facts: The company is incorporated in the State of New Jersey; it has offices in New York; it rents tank-cars to the Standard Oil Company, a Kentucky corporation. The agreements and settlements are made outside of this State. The cars are furnished for use by the Standard Oil Company; and the railroad company, in lieu of providing tank-cars, pays to the tank company $3/4$ of a cent per mile for hauling each car. The Standard Oil Company brings a large amount of oil to Jacksonville, Florida, and Savannah, Georgia, mainly by marine transportation. From these points oil is sent out by means of the tank-cars to different places in the interior. A number of these cars come into Georgia and are used there and elsewhere.

Under such facts, we are unable to see what special franchise the company exercises under any grant from this State. It is at least doubtful whether the tax authorities of Georgia could tax a franchise, strictly so called, which was granted by another State, as distinguished from intangible property. We hold, therefore, that, while the purpose of the cars for use may be considered in determining the value of those in Georgia, the company does not exercise in this State any such franchise as can be separately taxed. It is true that section 990 of the Civil Code uses broad language in defining equipment companies; and that if that language be construed in connection with section 1019, it may be argued with some force that the tank company came within the purview of those sections. But, in the light of the agreed statement of facts above mentioned, we think it is excluded from the operation thereof.

*Judgment affirmed in part and reversed in part. All the Justices concur, except*

LUMPKIN and HILL, JJ., dissenting. We concur in the ruling that what is known as the "unit rule" of assessment, such as has been held to be legal in regard to sleeping-car companies, express companies, and the like, may be applied to railroad-equipment companies. We do not contend that sections 989 and 990 of the Civil Code of 1910 are unconstitutional. But, upon mature reflection, we are unable to concur with the majority of the court in the construction which they have placed upon the agreement of facts upon which the case was submitted for the determination of the trial

court. In that agreement is recited the correspondence between the comptroller-general and attorneys on the subject, and the returns which were tendered by the company through its attorneys are set out. But the agreement of facts also contains, among other things, the following: "On April 7th, 1914, when the defendant entered an assessment, in his office, of property and franchises of the plaintiff as shown hereinbefore, he had no other information for any of the years 1907 to 1914 inclusive than was contained in the said return filed by plaintiff on March 16th, 1914, and embraced in this statement and which was refused by the defendant, and did not know what cars defendant had had in Georgia during any of said named years, nor did he ascertain the value of such cars, but his act was taken on such information hereinbefore shown; and that the assessment so entered by the defendant in his office against the plaintiff's property, during said period for each of said years, embraces the valuation of about three hundred cars in excess of what plaintiff actually had in the State of Georgia during said years, of the approximate value of $250,000 each year; and that the true value of a tank-car is about eight hundred and thirty ($830) dollars per car; that for the year 1914 the assessment entered against plaintiff by defendant covered the value of at least three hundred and fifty cars in excess of the number of cars plaintiff actually had in the State of Georgia for the time the said tax was assessed." Later in the agreement occurs the following: "The foregoing returns tendered by the plaintiff and rejected by the defendant embrace the full number of cars in said State belonging to the plaintiff for each of the said years, at their full value, and the same are embraced in the schedule A referred to," etc. In the petition there are the following allegations: "Plaintiff avers that the mileage of railroad traversed by its cars in the several States has no relation whatever to the number of cars in use or located in such State. That in several States other than Georgia, plaintiff does, at different localities, what might be called a strictly local business; large numbers of these cars are there located, which are moved on a local mileage of limited distance, confined entirely within such State." The answer admitted the allegations of fact contained in each of the several paragraphs of the petition, but denied the conclusions of law therein set up; and alleged that the plaintiff did exercise a franchise in the State of Georgia of the

value of $27,685, and on April 7, 1914, "this defendant did assess the property of complainant of Georgia at a total valuation of $343,566 for taxation for the years 1914, 1913, 1912, 1911, 1910, 1909, 1908, and on said last-named day notified the company that they would have 20 days from said date in which to decide whether to accept this valuation or to submit to arbitration the question of valuation of its property."

We have not undertaken to set out the entire agreement of facts, but we think that those portions which are stated above will suffice to show that the actual application sought to be made of the "unit rule" in this case was illegal. We do not contend that a proper assessment on the basis of the "unit rule" can not be made, but we are constrained to think that the agreement shows that what has been done would have the effect of taxing property outside of the State.