[S. F. Nos. 9080, 9081, 9082, 9083, 9084, 9085. In Bank.—April 4, 1921.]

## THE PULLMAN COMPANY, a Corporation, Appellant, v. FRIEND W. RICHARDSON, as Treasurer of the State of California, Respondent.

[S. F. No. 9183. In Bank.—April 4, 1921.]

## WALKER D. HINES, as Director General, etc., et al., Appellants, v. FRIEND W. RICHARDSON, as Treasurer, etc., Respondent.

[1] TAXATION — COMMON CARRIERS — VALUATION OF PROPERTY—GROSS RECEIPTS—INTERSTATE BUSINESS.—The gross receipts of a common carrier engaged in interstate commerce can be considered as a basis in a *bona. fide* effort to determine the value of the carrier's property within the state, and if the value so derived from the consideration of these gross receipts from interstate commerce and from intrastate commerce is the fair valuation of the property within the state subject to taxation, the tax is valid.

[2] ID.—CALIFORNIA CONSTITUTION—PROPERTY TAX.—The taxes levied by section 14, article XIII, of the state constitution are taxes upon property rather than upon receipts or income.

[3] ID.—TAX LAWS—DETERMINATION OF VALIDITY.—The question as to whether or not a particular taxing law violates the federal constitution depends upon the practical operation and the effect of the tax imposed and not upon the definitions or declarations of the state authorities.

[4] ID.—EARNINGS AS BASIS OF PROPERTY VALUE.—It is proper, as a basis on which to establish the value for the purpose of taxation of property of a common carrier doing interstate business as well as intrastate business in this state, to consider the earnings derived from its property, tangible and intangible, within the state; and it is proper to consider the proportion of its receipts derived from its interstate business earned within the state as an element of that basis.

[5] ID.—APPORTIONMENT OF INTERSTATE EARNINGS — STATE SYSTEM.— The system adopted by the state constitution for apportionment of interstate earnings of a common carrier doing both interstate and intrastate business is the fairest possible method of such apportionment, and by said method the state does not assert jurisdiction over any earnings from the interstate business, not actually

1. Valuation of railroad property for purposes of taxation, notes, Ann. Cas. 1916E, 1180, 1196, 1198, 1201; Ann. Cas. 1917E, 110.

derived from that portion of said business actually conducted within the state, and does not draw to itself earnings derived from capital or property elsewhere situated, and the method adopted for the ascertainment of local values is wholly unobjectionable.

[6] ID. — FOREIGN CORPORATIONS — FORFEITURE FOR NONPAYMENT OF TAXES—STATUTE OF 1911.—The validity of that portion of the act of 1911 (Stats. 1911, 530, 548, sec. 24), declaring a forfeiture of the right of a foreign corporation to do business in the state if taxes are not paid, is not involved in an action to recover taxes already paid.

APPEAL from a judgment of the Superior Court of the City and County of San Francisco. Geo. A. Sturtevant, Judge. Affirmed.

The facts are stated in the opinion of the court.

T. C. Coogan, Burke Corbet, Corbet & Selby, Francis B. Daniels and Gustavus S. Fernald for Appellants.

U. S. Webb, Attorney-General, and Raymond Benjamin for Respondent.

WILBUR, J.—The plaintiff brought seven separate suits for the purpose of recovering from the treasurer of the state of California taxes paid by it under protest. The taxes were levied at the rate of either three or four per cent upon the gross receipts from the business of the plaintiff transacted in the state of California. The rate is fixed and the tax authorized by section 14, article XIII, of the constitution of California, amended in 1910, and statutes passed in pursuance thereof. Approximately fifty per cent of the gross revenue of the plaintiff corporation in California consists of returns from the interstate business of the plaintiff corporation. The amount of the California revenue derived from interstate business is ascertained by apportioning to the business in the state of California the proportion of the fare derived from each item of the business of the plaintiff, into, out of, and through the state of California, which the mileage traveled by the passenger in California bears to the total mileage traveled by him upon his ticket, and by adding these several amounts to ascertain the total amount of gross receipts for the year for such business. These amounts were

furnished to the state board of equalization, and are as follows:

| Year | Intrastate Business | Interstate Business | Total Business | Rate | Total Tax | Amount Plaintiff Seeks to Recover |
|---|---|---|---|---|---|---|
| 1912 | $ 938,786.80 | $ 966,516.17 | $1,905,302,97 | 3% | $57,159.08 | $28,995.48 |
| 1913 | 1,000,963.16 | 953,036.44 | 1,953,999.60 | 3% | 58,619.98 | 28,591.09 |
| 1914 | 1,124,877.77 | 956,213.61 | 2,081,091.38 | 4% | 83,243.66 | 38,248.55 |
| 1915 | 1,196,719.76 | 1,004,681.57 | · 2,201,401.33 | 4% | 88,056.06 | 40,187.26 |
| 1916 | 998,330.30 | 855,072.22 | 1,853,402.52 | 4% | 73,209.40 | 33,811.67 |
| 1917 | 1,053,141.34 | 1,025,743.33 | 2,078,884.67 | 4% | 82,115.94 | 40,516.86 |
| 1918 | 1,214,463.33 | 1,182,424.90 | 2,396,888.23 | 4% | 94,677.08 | 46,705.78 |

In considering the effect of this method of apportionment of the passenger fares derived from interstate business, it should be observed in passing that, if the rates of the plaintiff corporation for long interstate hauls are less proportionately per mile than for shorter hauls in intrastate business, it follows that if two passengers proceed from San Francisco to the state line at Yuma, one going to New York or Boston by the way of New Orleans and the other stopping at the state line, the amount of fare apportioned to the state of California would be less in the case of the traveler who is going to Boston or New York than in the case of the one who stops at the state line. If the state is entitled to levy a tax in the manner adopted, this would seem to be the fairest method of apportioning the receipts of an interstate common carrier. If the same system was adopted in all the states traversed by the carrier, the sum of the amounts thus apportioned to the several states would be equal to the gross receipts of the carrier derived from such interstate commerce.

Appellant's contention is that a tax upon the gross receipts derived from interstate commerce is in violation of the federal constitution giving Congress the power to regulate interstate commerce, and for that reason seeks to recover the proportion of the tax which is based upon the gross receipts derived from interstate commerce.

[1] It is apparently conceded by the appellant that the gross receipts of a common carrier engaged in interstate commerce can be considered as a basis in a *bona fide* effort to determine the value of the carrier's property within the state, and that if the value so derived from the consideration of these gross receipts from interstate commerce and from intrastate commerce is the fair valuation of the property within the state subject to taxation, that the tax is valid.

If not so conceded, it is clear that such a tax is valid. (*Wisconsin & Michigan Ry. Co.* v. *Powers*, 191 U. S. 379, [48 L. Ed. 229, 24 Sup. Ct. Rep. 107, see, also, Rose's U. S. Notes].)

The section of the California constitution authorizing and levying the tax declares that it is a property tax in lieu of all other taxes, state, county and municipal, and if this declaration is a true statement of the fact, it is undoubtedly true that the method is unobjectionable. The constitution, after enumerating the various companies which are required to pay the tax levied under its provision, requires that they "(a) . . . shall annually pay to the state a tax upon their franchises, roadways, roadbeds, rails, rolling stock, poles, wires, pipes, canals, conduits, rights of way, and other property, or any part thereof, used exclusively in the operation of their business in this state, computed as follows: Said tax shall be equal to the percentages hereinafter fixed upon the gross receipts from operation of such companies and each thereof within this state. . . . Such taxes shall be in lieu of all other taxes and licenses, state, county and municipal, upon the property above enumerated of such companies except as otherwise in this section provided. . . . All property enumerated in subdivision a [*supra*], b and d of this section shall be subject to taxation, in the manner provided by law to pay the principal and interest of any bonded indebtedness created and outstanding by any city, city and county, county, town, township or district, before the adoption of this section. The taxes so paid for principal and interest on such bonded indebtedness shall be deducted from the total amount paid in taxes for state purposes. . . . "

[2] The question as to whether or not the taxes levied by section 14, article XIII of the constitution are taxes upon property rather than upon receipts or income has several times been considered by this court and in each instance it has been declared to be essentially a property tax.

The opinion in *City and County of San Francisco* v. *Pacific Tel. & Tel. Co.*, 166 Cal. 244, [135 Pac. 971], gives a history of the enactment of section 14, article XIII of the constitution, to which we refer without repeating the same herein. With reference to the nature of the tax it was therein stated:

"The appellant's contention, briefly stated, is that the constitutional provision relieves the companies named from no burden except that of taxes *upon the property* theretofore enumerated, and that the charge imposed by the ordinance is a business or occupation tax, and not a tax upon property at all, and therefore not covered by the so-called exemption. The respondent, on the other hand, claims that under a fair reading of the constitutional amendment, the liability of a telephone company to pay a percentage of its gross receipts was designed to exclude the power of the state, or of any county or municipality, to exact from it any further revenue (except as stated in the proviso above quoted) whether by way of a direct tax upon its property or in the guise of a license fee upon its business. . . .

"The percentages enumerated in the amendment are declared to be 'in lieu of all other taxes,' etc., and such percentages were, doubtless, fixed at higher rates than would have been adopted in the absence of a restriction on other taxation. These considerations are of weight in determining the rule of interpretation by which the provision regarding freedom from other taxation is to be read. . . .

"For these reasons we agree with the conclusion of the learned trial judge that the taxes imposed by the amendment supersede, not only other taxes upon property, but also license fees like those exacted by the ordinance of the city and county. This result, it seems to us, not only accords with the language of the part of the amendment defining the tax, but is in harmony with the apparent purpose and scope of the new system of taxation created by the amendment."

In the opinion in the case of *Lake Tahoe Ry. etc. Co.* v. *Roberts,* 168 Cal. 551, [Ann. Cas. 1916E, 1196, 143 Pac. 786], it is said: "The fact that these manifest contingencies have not been provided for by law is additional evidence that the framers of the constitution meant what they said, namely, that *only property* used exclusively, or only a severable part of property used exclusively in the operation of the business of the company, should be included in the *list of property whose sole and only tax is covered by the gross revenue percentage,* and that the earnings of other properties not so exclusively used in whole or in part are not an element in the admeasurement of this tax." (Italics ours.)

In the opinion in *Pacific Gas & Electric Co.* v. *Roberts,* 168 Cal. 420, [143 Pac. 700], additional history of the constitutional amendment is set out on page 423, to which we refer, and the decisions of the supreme court of the United States on this subject are thus summarized:

"Without pausing here to review the decisions of the su‹ preme court bearing upon the question, but contenting ourselves with a subsequent reference to some of them, it may be said that the conclusions of the supreme court were that property used in the public service frequently acquired a value in the use, which value was something greater than the value of the property not engaged in such use; that by the systemization and unification of such properties in use they in the aggregate acquired a special value by virtue of this unity of use; that this special value was in the nature of property; that a fair tax upon gross earnings bore such a relation to the values of these properties under their unity of use as to justify such a tax upon revenue as being a legal and commutated or substituted tax for other taxes which were or might have been levied. (*Maine* v. *Grand Trunk Ry.,* 142 U. S. 217, [35 L. Ed. 994, 12 Sup. Ct. Rep. 121]; *Cleveland & St. Louis Ry. Co.* v. *Backus,* 154 U. S. 439, [38 L. Ed. 1041, 14 Sup. Ct. Rep. 1122]; *Erie Ry.* v. *Pennsylvania,* 158 U. S. 440, [39 L. Ed. 1046, 15 Sup. Ct. Rep. 900]; *Adams Express Co.* v. *Ohio,* 165 U. S. 194, [41 L. Ed. 683, 17 Sup. Ct. Rep. 305]; *United States Express Co.* v. *Minnesota,* 223 U. S. 335, [56 L. Ed. 459, 32 Sup. Ct. Rep. 211, see, also, Rose's U. S. Notes].)

"So much for the justness and reasonableness and legality of the new method. . . . "

While we have not heretofore considered the proposition from the standpoint of its relation to interstate commerce, it is clear from the foregoing that this court has always considered the tax to be in fact what it purports to be, namely, a tax upon the property of the company as it is described in the constitution and with more particularity in the assessment by the state board of equalization.

The validity of such a tax from the standpoint of the interstate commerce clause of the federal constitution, as interpreted by the supreme court of the United States, received careful consideration from the commissioners, who were appointed to formulate and report upon the proposed system of

taxation. Before the appointment of these commissioners, in pursuance of an act of the legislature authorizing such a body to be formed, the supreme court of the United States in a number of cases had considered whether or not certain forms of state legislation authorizing the taxation of interstate commerce transportation companies was a valid exercise of the power of the state. The reports of the commission show that these cases were considered by them in formulating their plan of taxation and that an effort was made to conform to the then latest expression of the supreme court of the United States upon the subject. A quotation from *Wisconsin & Michigan Ry. Co.* v. *Powers,* 191 U. S. 379, [48 L. Ed. 229, 24 Sup. Ct. Rep. 107, see, also, Rose's U. S. Notes], *supra,* decided in 1903, will indicate the principle upon which the tax commission relied in the drafting of the constitutional amendment, which was afterward submitted to the state legislature and by the legislature submitted to the people for adoption. The court was considering the validity of a statute of Michigan levying a specific tax upon the property and business of every railroad corporation operated in the state. That statute provided that "when the railroad lies partly within and partly without this state, *prima facie,* the gross income of said company from such road for the purposes of taxation shall be on the actual earnings of the road in Michigan, computed by adding to the income derived from the business transacted by said company entirely within this state, such proportion of the income of said company arising from the interstate business as the length of the road over which said interstate business is carried in this state bears to the entire length of the road over which said interstate business is carried."

The court in disposing of the contention that the statute was an invalid interference with interstate commerce said: "We need say but a word in answer to the suggestion that the tax is an unconstitutional interference with interstate commerce. In form the tax is a tax on 'the property and business of such railroad corporation operated within the state,' computed upon certain percentages of gross income. The *prima facie* measure of the plaintiff's gross income is substantially that which was approved in *Maine* v. *Grand Trunk Ry. Co.,* 142 U. S. 217, 228, [35 L. Ed. 994, 12 Sup. Ct. Rep. 121]. See, also, *Western Union Tel. Co.*

v. *Taggart,* 163 U. S. 1, [41 L. Ed. 49, 16 Sup. Ct. Rep. 1054]. Decree affirmed."

A decision (*Galveston etc. Ry. Co.* v. *Texas,* 210 U. S. 217, [52 L. Ed. 1031, 28 Sup. Ct. Rep. 638]), rendered later (1907), was also available before the legislature or the people finally acted upon the proposed plan of taxation. In that case it was said: "So it has been held that a tax on the property and business of a railroad operated within the state might be estimated *prima facie* by gross income, computed by adding to the income derived from business within the state the proportion of interstate business equal to the proportion between the road over which the business was carried within the state to the total length of the road over which it was carried. (*Wisconsin & Michigan Ry. Co.* v. *Powers,* 191 U. S. 379, [48 L. Ed. 229, 24 Sup. Ct. Rep. 107].)"

Of course, the fact that the constitutional provision assailed by the appellant purports to levy a tax upon the property and to consider the gross receipts solely as a basis for the valuation thereof is not necessarily determinative of the question, however persuasive and definite such a declaration may be.

[3] The question as to whether or not a particular taxing law violates the federal constitution depends upon the practical operation and the effect of the tax imposed and not upon the definitions or declarations of the state authorities. The rule is thus stated in the recent case of *Shaffer* v. *Carter,* 252 U. S. 37, [64 L. Ed. 445, 40 Sup. Ct. Rep. 221]: "For, where the question is whether a state taxing law contravenes rights secured by that instrument, the decision must depend not upon any mere question of form, construction, or definition, but upon the practical operation and effect of the tax imposed. (*St. Louis Southwestern Ry. Co.* v. *Arkansas,* 235 U. S. 350, 362, [59 L. Ed. 265, 35 Sup. Ct. Rep. 99]; *Mountain Timber Co.* v. *Washington,* 243 U. S. 219, 237, [Ann. Cas. 1917D, 642, 61 L. Ed. 685, 37 Sup. Ct. Rep. 260]; *Crew Levick Co.* v. *Pennsylvania,* 245 U. S. 292, 294, [62 L. Ed. 295, 38 Sup. Ct. Rep. 126]; *American Mfg. Co.* v. *St. Louis,* 250 U. S. 459, 463, [63 L. Ed. 1084, 39 Sup. Ct. Rep. 522].) The practical burden of a tax imposed upon the net income derived by a nonresident from a business carried on within the state certainly is no greater than that of a tax

upon the conduct of the business, and this the state has the lawful power to impose, as we have seen.''

To the same effect is the case of *American Mfg. Co.* v. *St. Louis, supra,* where it is said: ''As a matter of construction, this, upon familiar principles, is conclusive upon us. But, as has been held very often, the question whether a state law or a tax imposed thereunder deprives a party of rights secured by the federal constitution depends not upon the form of the act, nor upon how it is construed or characterized by the state court, but upon its practical operation and effect. (*St. Louis Southwestern Ry. Co.* v. *Arkansas,* 235 U. S. 350, 362, [59 L. Ed. 265, 35 Sup. Ct. Rep. 99]; *Mountain Timber Co.* v. *Washington,* 243 U. S. 219, 237, [Ann. Cas. 1917D, 642, 61 L. Ed. 685, 37 Sup. Ct. Rep. 260]; *Crew Levick Co.* v. *Pennsylvania,* 245 U. S. 292, 294, [62 L. Ed. 295, 38 Sup. Ct. Rep. 126].)''

Before considering the effect of our new constitutional scheme of taxation upon interstate commerce, we cite some of the decisions of the supreme court of the United States on the subject, rendered since the system was adopted by this state. The decision of that court in *Union Tank Line Co.* v. *Wright,* 249 U. S. 275, [63 L. Ed. 602, 39 Sup. Ct. Rep. 276], dealt with a statute of Georgia wherein that state had provided for the levying of a tax upon the interstate commerce of the Union Tank Line Company, based upon the proportion that the miles in Georgia over which the cars of that company moved bore to the total miles so traversed in all the states. It is to be observed that the plan did not consider ''cars mileage,'' or ''ton mileage,'' or ''receipts,'' or ''revenue,'' either gross or net, for such haulage, as is pointed out in the opinion holding the tax invalid, from which we quote as follows:

''A state may not tax property belonging to a foreign corporation which has never come within its borders—to do so under any formula would violate the due process clause of the Fourteenth Amendment. In so far, however, as movables are regularly and habitually used and employed therein, they may be taxed by the state according to their fair value along with other property subject to its jurisdiction, although devoted to interstate commerce. While the valuation must be just it need not be limited to mere worth of the articles considered separately but may include as well

'the intangible value due to what we have called the organic relation of the property in the state to the whole system.' How to appraise them fairly when the tangibles constitute part of a going concern operating in many states often presents grave difficulties; and absolute accuracy is generally impossible. We have accordingly sustained methods of appraisement producing results approximately correct—for example, the mileage basis in case of a telegraph company (*Western Union Tel. Co.* v. *Massachusetts*), and the average amount of property habitually brought in and carried out by a car company (*American Refrigerator Transit Co.* v. *Hall*). But if the plan pursued is arbitrary and the consequent valuation grossly excessive it must be condemned because of conflict with the commerce clause or the Fourteenth Amendment or both. (*Western Union Tel. Co.* v. *Massachusetts*, 125 U. S. 530, [31 L. Ed. 790, 8 Sup. Ct. Rep. 961]; *Marye* v. *Baltimore & Ohio R. R. Co.*, 127 U. S. 117, [32 L. Ed. 94, 8 Sup. Ct. Rep. 1037]; *Pullman's Palace Car Co.* v. *Pennsylvania*, 141 U. S. 18, 26, [35 L. Ed. 613, 11 Sup. Ct. Rep. 876]; *Adams Express Co.* v. *Ohio State Auditor*, 165 U. S. 194, [41 L. Ed. 683, 17 Sup. Ct. Rep. 305]; S. C., 166 U. S. 185, [41 L. Ed. 965, 17 Sup. Ct. Rep. 604]; *American Refrigerator Transit Co.* v. *Hall*, 174 U. S. 70, [43 L. Ed. 899, 19 Sup. Ct. Rep. 599]; *Union Refrigerator Transit Co.* v. *Lynch*, 177 U. S. 149, [44 L. Ed. 708, 20 Sup. Ct. Rep. 631]; *Fargo* v. *Hart*, 193 U. S. 490, [48 L. Ed. 761, 24 Sup. Ct. Rep. 498]; *Cudahy Packing Co.* v. *Minnesota*, 246 U. S. 450, 453, [62 L. Ed. 827, 38 Sup. Ct. Rep. 373].)

"In the present case the comptroller-general made no effort to assess according to real value or otherwise than upon the ratio which miles of railroad in Georgia over which the cars moved bore to total mileage so traversed in all states. Real values—the essential aim—of property within a state cannot be ascertained with even approximate accuracy by such process; the rule adopted has no necessary relation thereto. *During a year two or three cars might pass over every mile of railroad in one state while hundreds constantly employed in another moved over lines of less total length.* Fifty-seven was the average number of cars within Georgia during 1913 and each had a 'true' value of $830. Thus the total there subject to taxation amounted to *$47,310*—the challenged assessment specified *$291,196.* . . .

"*Pullman's Palace Car Co.* v. *Pennsylvania, supra,* relied on by defendant in error, contains the following passage which seems to uphold the Georgia rule: 'The mode which the state of Pennsylvania adopted, to ascertain the proportion of the company's property upon which it should be taxed in that state, was by taking as a basis of assessment such proportion of the capital stock of the company as the number of miles over which it ran cars within the state bore to the whole number of miles, in that and other states, over which its cars were run. This was a just and equitable method of assessment; and, if it were adopted by all the states through which these cars ran, the company would be assessed upon the whole value of its capital stock, and no more.' But the point therein spoken of was unnecessary to determination of the cause; and so far as the quoted passage sanctions the specified rule for ascertaining values as generally appropriate, just, unobjectionable and productive of conclusive results, it must be regarded as *obiter dictum,* and we cannot now approve or follow it." (Italics ours.)

It is worthy of note that three members of the supreme court considered that even this method of assessment was a valid exercise of the state taxing power as theretofore determined by the supreme court. The opinion of the minority is thus stated by Mr. Justice Pitney, Mr. Justice Brandeis and Mr. Justice Clarke concurring:

"The supreme court of Georgia sustained the tax on the authority of numerous decisions of this court, cited for the purpose. (143 Ga. 765, [85 S. E. 994]; 146 Ga. 489, [91 S. E. 680].) This court reverses the judgment, and holds the taxing law unconstitutional, upon reasoning to which I am unable to yield assent.

"In my opinion the Georgia system of taxing movable property of this character when habitually employed in the state, and the decision of the state supreme court sustaining the particular taxes in question, are based upon a correct view of the powers of the state under the federal constitution, and are in entire harmony with principles laid down in authoritative decisions of this court which have remained unchallenged for more than a quarter of a century. (*Western Union Tel. Co.* v. *Massachusetts,* 125 U. S. 530, 552, [31 L. Ed. 790, 8 Sup. Ct. Rep. 961]; *Marye* v. *Baltimore &*

*Ohio R. R. Co.,* 127 U. S. 117, 123, [32 L. Ed. 94, 8 Sup. Ct. Rep. 1037]; *Pullman's Palace Car Co.* v. *Pennsylvania,* 141 U. S. 18, 22, 26 et seq., [35 L. Ed. 613, 11 Sup. Ct. Rep. 876]; *Cleveland etc. Ry. Co.* v. *Backus,* 154 U. S. 439, 445, [38 L. Ed. 1041, 14 Sup. Ct. Rep. 1122]; *Western Union Tel. Co.* v. *Taggart,* 163 U. S. 1, 14, [41 L. Ed. 49, 16 Sup. Ct. Rep. 1054]; *Adams Express Co.* v. *Ohio State Auditor,* 165 U. S. 194, 221, [41 L. Ed. 683, 17 Sup. Ct. Rep. 305]; S. C., 166 U. S. 185, [41 L. Ed. 965, 17 Sup. Ct. Rep. 604]; *American Refrigerator Transit Co.* v. *Hall,* 174 U. S. 70, 75 et seq., [43 L. Ed. 899, 19 Sup. Ct. Rep. 599]; *Union Refrigerator Transit Co.* v. *Lynch,* 177 U. S. 149, 152, [44 L. Ed. 708, 20 Sup. Ct. Rep. 631]; *Cudahy Packing Co.* v. *Minnesota,* 246 U. S. 450, 453, [62 L. Ed. 827, 38 Sup. Ct. Rep. 373].)''

The appellant relies very strongly upon a recent decision of that court, *Galveston etc. Ry. Co.* v. *Texas,* 210 U. S. 217, [52 L. Ed. 1031, 28 Sup. Ct. Rep. 638], in which a tax of one per cent of their gross receipts is levied upon all railroads operating in the state. The tax was held invalid. As we understand the main opinion in that case, the court concluded that the Texas statute taxed all revenue of such interstate commerce carrier actually received within the state without regard to the proportion earned in the state, although in some cases the larger part of their gross receipts is derived from the carriage of passengers and freight coming from, or destined to, other points without the state. The tax was regarded by the majority of that court as a tax upon the gross receipts derived from interstate commerce, and in addition to *ad valorem* taxes upon a valuation of their property "taken as a going concern." The minority of the court, Mr. Justice Harlan, Mr. Chief Justice Fuller, Mr. Justice White, and Mr. Justice McKenna held that the tax should be sustained as an occupation tax, levied by the state law as interpreted by the supreme court of Texas as applicable only to the proportion of the interstate commerce gross receipts, apportioned to the mileage traveled thereby in Texas, in proportion to the total mileage traveled. The main opinion recognizes and is based upon the principles of such taxation theretofore established, and relied upon by the people of this state in adopting the new method of taxa-

tion, as will be apparent from the following quotation therefrom: "It being once admitted, as of course it must be, that not every law that affects commerce among the states is a regulation of it in a constitutional sense, nice distinctions are to be expected. Regulation and commerce among the states both are practical rather than technical conceptions, and, naturally, their limits must be fixed by practical lines. As the property of companies engaged in such commerce may be taxed (*Pullman's Palace Car Co.* v. *Pennsylvania*, 141 U. S. 18, [35 L. Ed. 613, 11 Sup. Ct. Rep. 876]), and may be taxed at its value as it is, in its organic relations, and not merely as a congeries of unrelated items, taxes on such property have been sustained that took account of the augmentation of value from the commerce in which it was engaged. (*Adams Express Co.* v. *Ohio State Auditor*, 165 U. S. 194, [41 L. Ed. 683, 17 Sup. Ct. Rep. 305]; S. C., 166 U. S. 185, [41 L. Ed. 965, 17 Sup. Ct. Rep. 604]; *Fargo* v. *Hart*, 193 U. S. 490, 499, [48 L. Ed. 761, 24 Sup. Ct. Rep. 498].) So it has been held that a tax on the property and business of a railroad operated within the state might be estimated *prima facie* by gross income, computed by adding to the income derived from business within the state the proportion of interstate business equal to the proportion between the road over which the business was carried within the state to the total length of the road over which it was carried. (*Wisconsin & Michigan Ry. Co.* v. *Powers*, 191 U. S. 379, [48 L. Ed. 229, 24 Sup. Ct. Rep. 107].)

"Since the commercial value of property consists in the expectation of income from it, and since taxes ultimately, at least in the long run, come out of income, obviously taxes called taxes on property and those called taxes on income or receipts tend to run into each other somewhat as fair value and anticipated profits run into each other in the law of damages. The difficulty of distinguishing them became greater when it was decided, not without much debate and difference of opinion, that interstate carriers' property might be taxed as a going concern. In *Wisconsin & Michigan Ry. Co.* v. *Powers*, *supra*, the measure of property by income purported only to be *prima facie* valid. But the extreme case came earlier. In *Maine* v. *Grand Trunk Ry. Co.*, 142 U. S. 217, [35 L. Ed. 994, 12 Sup. Ct. Rep. 121], 'an annual

excise tax for the privilege of exercising its franchise,' was levied upon every one operating a railroad in the state, fixed by percentages, varying up to a certain limit, upon the average gross receipts per mile multiplied by the number of miles within the state when the road extended outside. This seems at first sight like a reaction from the *Philadelphia & Southern Mail Steamship Company case.* But it may not have been. The estimated gross receipts per mile may be said to have been made a measure of the value of the property per mile. That the effort of the state was to reach that value and not to fasten on the receipts from transportation as such was shown by the fact that the scheme of the statute was to establish a system. The buildings of the railroad and its lands and fixtures outside of its right of way were to be taxed locally, as other property was taxed, and this excise with the local tax were to be in lieu of all taxes. The language shows that the local tax was not expected to include the additional value gained by the property being part of a going concern. That idea came in later. The excise was an attempt to reach that additional value. The two taxes together fairly may be called a commutation tax. (See *Ficklen* v. *Taxing District of Shelby County,* 145 U. S. 1, 23, [36 L. Ed. 601, 12 Sup. Ct. Rep. 810] ; *Postal Tel. Cable Co.* v. *Adams,* 155 U. S. 688, 697, [39 L. Ed. 311, 15 Sup. Ct. Rep. 360] ; *McHenry* v. *Alford,* 168 U. S. 651, 670, 671, [42 L. Ed. 614, 18 Sup. Ct. Rep. 242].)

" 'By whatever name the exaction may be called, if it amounts to no more than the ordinary tax upon property or a just equivalent therefor, ascertained by reference thereto, it is not open to attack as inconsistent with the constitution.' (*Postal Tel. Cable Co.* v. *Adams,* 155 U. S. 688, 697, [39 L. Ed. 311, 15 Sup. Ct. Rep. 360]. See *New York etc. R. R. Co.* v. *Pennsylvania,* 158 U. S. 431, 438, 439, [39 L. Ed. 1043, 15 Sup. Ct. Rep. 896].) The question is whether this is such a tax. It appears sufficiently, perhaps from what has been said, that we are to look for a practical rather than a logical or philosophical distinction. The state must be allowed to tax the property and to tax it at its actual value as a going concern. On the other hand, the state cannot tax the interstate business. The two necessities hardly admit of an absolute logical reconciliation.

Yet the distinction is not without sense. When a legislature is trying simply to value property, it is less likely to attempt to or effect injurious regulation than when it is aiming directly at the receipts from interstate commerce. A practical line can be drawn by taking the whole scheme of taxation into account. That must be done by this court as best it can. Neither the state courts nor the legislatures, by giving the tax a particular name or by the use of some form of words, can take away our duty to consider its nature and effect. If it bears upon commerce among the states so directly as to amount to a regulation in a relatively immediate way, it will not be saved by name or form. (*Stockard* v. *Morgan*, 185 U. S. 27, 37, [46 L. Ed. 785, 22 Sup. Ct. Rep. 576]; *Asbell* v. *Kansas*, 209 U. S. 251, 254, 256, [14 Ann. Cas. 1101, 52 L. Ed. 778, 28 Sup. Ct. Rep. 485].)''

That the Texas case just quoted is not decisive of the case at bar is made apparent by a later decision of the supreme court of the United States much relied upon by respondent, wherein a law of Minnesota is sustained, requiring car-loaning companies to pay a tax upon their gross earnings within the state, in lieu of other taxes on the property. The matter is discussed as follows in the opinion (*Cudahy Packing Co.* v. *Minnesota*, 246 U. S. 450–452, [62 L. Ed. 827, 38 Sup. Ct. Rep. 373]):

''As construed and applied by the state court, the Minnesota law requires a freight line company, meaning a company furnishing or leasing cars to railroads for freight transportation, to report annually its gross earnings from the operation of its car line within the state and to pay, in lieu of other taxes on the property so employed, a tax fixed at a stated per cent of such earnings. That court holds that this law is an exertion of the power of the state to tax the property within its limits from which the earnings are derived and is intended to embody a practical method of reaching and valuing that property, tangible and intangible, for taxing purposes.

''In so far as the property constituting this car line is regularly or habitually used or employed in Minnesota it is within the taxing power of the state, although chiefly devoted or applied to interstate transportation. (*Pullman's Palace Car Co.* v. *Pennsylvania*, 141 U. S. 18, [35 L. Ed. 613, 11 Sup.

Ct. Rep. 876]; *Adams Express Co.* v. *Ohio,* 165 U. S. 194, [41 L. Ed. 683, 17 Sup. Ct. Rep. 305]; S. C., 166 U. S. 185, [41 L. Ed. 965, 17 Sup. Ct. Rep. 604]; *American Refrigerator Co.* v. *Hall,* 174 U. S. 70, [43 L. Ed. 899, 19 Sup. Ct. Rep. 599]; *Union Refrigerator Co.* v. *Lynch,* 177 U. S. 149, [44 L. Ed. 708, 20 Sup. Ct. Rep. 631].) This is not questioned; but it is insisted that the tax imposed is not a property tax but one laid directly on the gross earnings. *Of course, if it is laid on the earnings as such, they being derived largely from interstate commerce, it is an unconstitutional restraint or burden on such commerce and void.* (Italics ours.) (*Fargo* v. *Michigan,* 121 U. S. 230, [30 L. Ed. 888, 7 Sup. Ct. Rep. 857]; *Philadelphia & Southern Steamship Co.* v. *Pennsylvania,* 122 U. S. 326, [30 L. Ed. 1200, 7 Sup. Ct. Rep. 1118]; *Galveston etc. Ry. Co.* v. *Texas,* 210 U. S. 217, [52 L. Ed. 1031, 28 Sup. Ct. Rep. 638].) On the other hand, if what is done is to reach the property and not to tax the gross earnings, the latter being taken merely as an index or measure of the value of the former, it well may be that the objection urged against the tax is untenable; for, as this court has said, 'by whatever name the tax or taxes may be called that are fixed by reference to the value of the property, if they are not imposed because of its use in interstate or foreign commerce, and if they amount to no more than would be legitimate as an ordinary tax upon the property, valued with reference to the use in which it is employed, they are not open to attack, as restraining or burdening such commerce. (*St. Louis Southwestern Ry. Co.* v. *Arkansas,* 235 U. S. 350, 367, [59 L. Ed. 265, 35 Sup. Ct. Rep. 99]; *Postal Telegraph Co.* v. *Adams,* 155 U. S. 688, [39 L. Ed. 311, 15 Sup. Ct. Rep. 360]; *Wisconsin & Michigan Ry. Co.* v. *Powers,* 191 U. S. 379, 387, [48 L. Ed. 229, 24 Sup. Ct. Rep. 107]; *Fargo* v. *Hart,* 193 U. S. 490, 499, [48 L. Ed. 761, 24 Sup. Ct. Rep. 498]; *Galveston etc. Ry. Co.* v. *Texas, supra.*)

"As before stated, the state court regards the tax as imposed in respect of the property rather than the earnings, and the same view seems to be taken by the legislature, for the act of 1909 speaks of the tax as 'a tax upon its [the company's] property' and the act of 1911 says 'the value of such property [that used within the state] for purposes

of taxation is to be determined' by reference to the gross earnings from the mileage within the state. True, this local view is not conclusive on this court, but it cannot be rejected unless it can be said to be ill founded. . . .

"The other case [*United States Express Co.* v. *Minnesota,* 223 U. S. 335, [56 L. Ed. 459, 32 Sup. Ct. Rep. 211], involved a tax in Minnesota of a designated per cent of the gross earnings of an express company from business done in that state, the business being partly local and partly interstate commerce. The statute declared that the tax was to be in lieu of other taxes on the company's property, and the state court held that it was not in reality a tax on the gross earnings, but was a tax on the property, the earnings being taken merely as a measure of the value of the property for taxing purposes. We accepted and gave effect to that holding, not as being conclusive on us, but on the grounds that the property from which the earnings were derived was not to be otherwise taxed, that the tax was part of a system intended to reach the full value of the company's property in the state as reflected by the gross earnings, and that the amount of the tax did not appear to be in excess of what would be legitimate as an ordinary tax on the property, valued with reference to its use as part of a going concern. The case dealing with the Oklahoma tax [*Meyer* v. *Wells Fargo & Co.,* 223 U. S. 298, [56 L. Ed. 445, 32 Sup. Ct. Rep. 218], was distinguished by pointing out that that tax could not be regarded as a property tax, because it was to be in addition to another tax reaching the full value of the company's property in the state.

"The law imposing the present tax is closely patterned after the one exacting the tax upheld in *United States Express Co.* v. *Minnesota,* and contains the same declaration that the tax shall be in lieu of other taxes on the property. The statutes differ only in minor details and are both parts of a general system which the state applies to railroads, telephone lines and the like. So, unless this tax be otherwise distinguishable, it must, under the decision in that case, be regarded as a property tax and not as laid on the gross earnings."

The decision in this case is clear authority for the system of taxation incorporated in our constitution, and "the local

view" concerning the same embodied in that constitution and the statutes and court decisions defining its purpose and scope.

In a still later case the system adopted by California was apparently applied by the state authorities of Nevada, and sustained by the supreme court of the United States. (*State* v. *Wells Fargo & Co.,* 38 Nev. 505, 540, [150 Pac. 836]; *Wells Fargo & Co.* v. *Nevada,* 248 U. S. 165, [63 L. Ed. 190, 39 Sup. Ct. Rep. 62].) The valuation of eight hundred and fifty thousand dollars was sustained as a reasonable valuation, regardless of the method used in ascertaining its value. A valuation of three hundred dollars per mile was placed upon the business of the express company. This involved a capitalization of eight hundred and fifty thousand dollars, which was taken as the value for taxation. In connection with this valuation the supreme court of Nevada made the following statement: "Whether the system of determining the valuation of appellant's property, applied by the state board of assessors, was correct or not, it does not appear that it operated to impose an excessive valuation. The fact that erroneous methods may in good faith have been used to determine valuations is immaterial, we think, if an excessive valuation did not result therefrom." The supreme court of the United States affirmed the decision of the Nevada court (*Wells Fargo & Co.* v. *Nevada,* 248 U. S. 165, [63 L. Ed. 190, 39 Sup. Ct. Rep. 62]), stating: "As construed by the state court, the statute under which the tax was imposed does not provide for a privilege or franchise tax, but only for an *ad valorem* property tax. Acting under the statute, a state board valued the company's personal property, tangible and intangible, used in its express business within the state, at three hundred dollars per mile of line; . . . the assessor of Humboldt County . . . inaccurately described the property as consisting of the right to carry on express business there.

"Looking only at that entry there is strong ground for saying that the tax was laid on the privilege or act of doing an express business which was principally interstate. On the other hand, the action of the state board, on which the assessment concededly was predicated, indicates that what was taxed was the company's property in Humboldt County. The difference is vital, for, consistently with the commerce

clause of the federal constitution, the state could not tax the privilege or act of engaging in interstate commerce, but could tax the company's property within the state, although chiefly employed in such commerce. (*Adams Express Co.* v. *Ohio State Auditor*, 165 U. S. 194, 220, [32 L. Ed. 94, 8 Sup. Ct. Rep. 1037]; S. C., 166 U. S. 185, 218, [41 L. Ed. 965, 17 Sup. Ct. Rep. 604]; *Galveston etc. Ry. Co.* v. *Texas*, 210 U. S. 217, 225–227, [52 L. Ed. 1031, 28 Sup. Ct. Rep. 638]; *Cudahy Packing Co.* v. *Minnesota*, 246 U. S. 450, 453, [62 L. Ed. 827, 38 Sup. Ct. Rep. 373].)

"The company insists that the state is concluded by the entry on the assessment-roll. But the state court, as shown in its opinion, rejects that view and holds, in effect, that the entry must be construed in the light of the statute and the action of the state board, and that when this is done it is apparent that the tax was not laid on the privilege or act of engaging in interstate commerce, but on the company's property within the county. We perceive no ground for disturbing that ruling. In so far as it turns on the authority of the state board and the assessor under the statute and the relative effect to be given to their acts it is not reviewable here, and in so far as it relates to what really was the subject of the tax we think it was right. (See *Cudahy Packing Co.* v. *Minnesota, supra,* p. 454.) Evidently the company at one time took this view of the tax, for in an amendment to its answer we find an allegation that the state board 'valued the property used by this defendant at the rate or sum of three hundred dollars for every mile of railroad over which this defendant transacted business, and apportioned said assessment or tax to the various counties of the state in accordance with the number of miles of such railroads, so situated within said county, and that the tax herein sued for was not otherwise levied or assessed.' . . .

"It also is asserted that the state board in valuing the property acted on inaccurate data and applied erroneous standards which resulted in a valuation so excessive as to make the tax a burden on interstate commerce. It is true that some inaccurate data and some computations following erroneous standards were presented to the board by a state officer in support of a suggestion that the property be valued at five hundred dollars or more per mile of line. But the

suggestion was not adopted, and it is not shown that the board's valuation was based on the data and computations so presented. Besides, if the valuation was excessive, the company was entitled in the present suit to show the true value and to have the tax reduced accordingly. (Rev. Laws 1912, sec. 3664.) An attempt at such a showing was made, but the state court concluded therefrom that a valuation of three hundred dollars per mile, as fixed by the board, was not excessive. It may be that the showing was not complete, but, even if so, it was the company's showing and was all that was before the court. After examining it we think it discloses no ground for condemning the tax as a burden on interstate commerce.''

[4] It follows from the foregoing decisions that it is proper to consider, as a basis on which to establish the value of plaintiff's property in this state, the earnings derived from its property, tangible and intangible, within the state; and that it is proper to consider the proportion of its receipts derived from its interstate business, earned within the state as an element of that basis. [5] It is also clear that the system adopted by our state constitution for such apportionment of interstate earnings is the fairest possible method of such apportionment, and that by such method the state does not assert jurisdiction over any earnings from the interstate business, not actually derived from that portion of such business actually conducted within the state, and does not draw to itself earnings derived from capital or property elsewhere situated. In short, that the method adopted for the ascertainment of local values is wholly unobjectionable.

The appellant advances one other argument in support of its contention that the constitutional system of taxation is in reality a tax upon the gross revenues derived in part from interstate commerce and not a tax upon the appellant's property. The contention may best be stated in the words of the appellant: ''The facts regarding what was done refute completely the claim set up by the defendant in his answer and found by the court that the property was taxed at all. It was the *gross receipts and gross receipts only.*'' The claim is that the reports of the state board of equalization and assessment by them of appellant's property make manifest that the tax in question is not a property tax. For the

purpose of considering appellant's contention it will be
necessary to consider the method of fixing the rate or per-
centage of gross receipts (three per cent and later four per
cent) used in determining the tax.

Before the new scheme was recommended hearings were
had before this commission and all transportation companies,
including plaintiff, doing business in this state were given
an opportunity to present their views and their data upon
the subject. It is, perhaps, worthy of note that the report
of the commission shows that the plaintiff then stated that
it was unable to comply with the request of the commission
for information as to the proportion of its interstate busi-
ness conducted in California and contented itself with a
protest against any form of taxation which operated to place
a burden upon its interstate commerce.

The tax commission in its report of 1906 to the legislature
furnished the proper rate of taxation based on the gross
receipts in order to properly tax the property of the vari-
ous corporations involved in the amendment, as follows, to
wit:

"In view of the strength of the popular feeling that taxes
should be 'equal,' and of the obvious and essential justice of
such a demand, it is highly important to discover a practical
method for determining whether the burden of a tax which
it is proposed to impose upon the gross earnings of a given
class of corporations is the equivalent or not of a tax which
might be levied under an *ad valorem* plan. Such a method
has been devised by this commission. By the application of
this method we can ascertain what rate of tax on the gross
earnings is the equivalent of a given tax rate on the prop-
erty, and *vice versa.* This will make it possible to compare
any proposed gross earnings tax with an assumed 'fair' rate
on property.

"Briefly stated that method is: To determine what tax
rate on gross earnings is the equivalent of a given rate on
the property, for a given class of public-service corporations,
(1) ascertain what percentage of the gross earnings is net,
(2) ascertain what rate of interest would constitute a fair
return to investors in the securities of the class of public-
service corporations under consideration, then (3) divide the
percentage of net earnings by the rate of interest and mul-

tiply the result by the given tax rate on property.* *This method is not as rigid or as infallible as the mathematical statement of it might seem to imply. There is still room for difference of opinion.* But it has been found of great practical value in testing the probable effect of different rates on any set of assumptions. . . .

"In order to compute what rate of taxation on gross earnings is the equivalent of a given rate of taxation on the property, we have simply to divide the percentage of net earnings by the assumed rate of capitalization and multiply the result by whatever tax rate on the property we wish to compare the gross earnings rate with. Thus, for example, if we wish to impose, in the form of a gross earnings tax, a burden which shall be the equivalent of a tax of 1½ per cent on the property, then in the case of a railroad, taking the figures assessed above, we divide 36 by 6 or 8, whichever shall be determined upon as a fair rate at which to capitalize railroad earnings, and multiply the result by 1½, obtaining, at 6 per cent, 9 per cent as an equivalent rate on gross earnings, or at 8 per cent as a basis of capitalization, 6¾ per cent. If the tax rate on property or capital were fixed at 1 per cent, the above rates would become six per cent and 4½ per cent."

The commission of 1906 also shows in its report the close approximation between the value of railroad property as theretofore assessed by the state board of equalization for taxation purposes, and the value to be ascertained by the proposed system. That portion of the report is as follows:

"The question of the equity of the gross earnings tax as between different roads can be tested somewhat roughly by comparing the taxes now paid on the *ad valorem* plan with the taxes that would be paid on the gross earnings plan. This is done in the following table for the more important railroad systems of the state. It is not argued that the present system is equitable as between the different roads, but it

---

"*Expressed algebraically, let t equal the tax rate sought, n equal the percentage of net earnings to gross, i equal the interest rate on the investment, and r equal the given tax rate on property; then:

$$t = \frac{n}{i} \times r. \ldots$$

affords the easiest and most readily available basis of comparison:

| | Tax on Property. Present System 1904. | Per Cent of all Taxes on Railroads. | Tax on Gross Earnings at 4 Per Cent Proposed System. | Per Cent of all Taxes on Railroads. | Column 3 Reduced to Same Total as Column 1. |
|---|---|---|---|---|---|
| Southern Pacific System | $1,349,425 | 75.85 | $1,508,958 | 74.17 | $1,319,484.30 |
| Santa Fe System | 306,872 | 17.22 | 375,109 | 18.44 | 328,047.60 |
| California Northwestern and North Shore | 62,612 | 3.52 | 82,027 | 4.03 | 71,693.70 |
| Nevada - California-Oregon and Sierra Valleys | 4,666 | .262 | 7,661 | .37 | 6,582.30 |
| Salt Lake Road | 27,237 | 1.530 | 24,423 | 1.205 | 21,436.95 |
| Nevada County Narrow Gauge | 3,397 | .191 | 5,125 | .252 | 4,483.08 |
| Pacific Coast | 6,959 | .391 | 5,806 | .285 | 5,070.15 |
| Pajaro Valley Consolidated | 2,881 | .161 | 2,535 | .124 | 2,205.96 |
| Sierra Railway | 8,424 | .472 | 14,657 | .721 | 12,826.59 |
| Boca and Loyalton | 5,501 | .308 | 6,936 | .341 | 6,066.39 |
| Lake Tahoe | 1,700 | .095 | 1,265 | .062 | 1,102.98 |
| | *$1,779,174 | 100.00 | $2,034,502 | 100.00 | $1,779,000.00 |

*Includes state, county, city and district taxes.

"In the case of the larger roads the change of system would not materially alter their proportion of the total taxes on railroads. But in the case of some of the smaller roads the changes would be quite important."

The similarity of values derived by the assessment of individual items of property, and by adding such items and thus ascertaining the total value, and the system inaugurated by the constitution, can be determined by a comparison of the assessment of plaintiff's properties by the two methods for the same years. The use of the two methods of valuation resulted from the adoption of a constitutional amendment in 1910 requiring a tax to be levied upon all the property of the state for the Panama-Pacific Exposition.

While the discrepancies between these two valuations is pointed out by the plaintiff as an evidence of the inequality and excess of the percentage tax, the analysis of the figures by the attorney-general shows that the valuations of the plaintiff's property, ascertained by the two methods, were practically identical. In considering these figures, however, it is important to bear in mind that while the law directs that all property shall be assessed at its full cash value, as

a matter of fact experience has shown that the assessed value is less than 50 per cent of the actual value, or, to be more accurate, and use the figures of the state board of equalization in 1911, 1912, 1913, and 1914, the assessed value was 45.1 per cent of the actual value; in 1915, 41.991 per cent; 1916, 42.755 per cent.

If the state board of equalization had certified to the county assessors the true valuation of plaintiff's property instead of the percentage of its value based upon the system of assessment adopted by the county assessors, the plaintiff's property would have borne an excessive proportion of the tax. As stated by the supreme court of the United States in *Sunday Lake Iron Co.* v. *Township of Wakefield,* 247 U. S. 350, [62 L. Ed. 1154, 38 Sup. Ct. Rep. 495], "it must be regarded as settled that intentional systematic undervaluation by state officials of other taxable property in the same class contravenes the constitutional right of one taxed upon the full value of his property." This court has recognized such rule and has permitted a recovery of taxes levied upon such valuation. (*Los Angeles Gas & Electric Co.* v. *County of Los Angeles,* 162 Cal. 164, [9 A. L. R. 1277, 121 Pac. 384]; *Southern Pacific Land Co.* v. *County of San Diego,* 183 Cal. 543, [191 Pac. 931].)

In making the comparisons of values another fact must also be considered, namely, that the gross revenue method includes all operative property (Const., art. XIII, sec. 14), while the property valuation, by the state board of equalization, for taxation purposes according to the former plan excludes certain operative properties, which are separately assessed by the various local assessors.

For the purpose of comparison we will use the figures furnished by the attorney-general in his brief for plaintiff's property:

| Year. | Assessed Value. | Percentage of Actual Value. | Actual Value. | Value Ascertained from Percentage Gross Receipts. | Undervaluation by Latter Method. |
|---|---|---|---|---|---|
| 1911 | $2,995,760 | 45.1 | $6,642,438 | $5,020,112 | $1,620,000.00 |
| 1912 | 3,070,654 | 45.1 | 6,808,500 | 5,148,426.13 | 660,073.87 |
| 1913 | 3,270,246 | 45.1 | 7,251,000 | 7,238,579.13 | 12,421.13 |
| 1914 | 3,459,920 | 45.1 | 7,671,600 | 7,227,781.25 | 353,819.25 |
| 1915 | 2,913,253 | 42. | 6,936,300 | 6,009,143.88 | 927,156.22 |
| 1916 | 3,548,032 | 42.75 | 8,300,000 | 6,792,000 | 1,508,000.00 |

To such item of undervaluation must be added the operative properties locally assessed. Expressed in terms of tax the comparison is compiled by the attorney-general from the reports of the state board of equalization, and is shown in the next table.

"ASSESSMENT BY STATE BOARD OF EQUALIZATION.

"Assessment of Pullman Company's cars and franchises by state board of equalization and estimated amount of tax thereon if levied at average tax rate, compared with taxes paid on basis of gross receipts: These figures do *not* include assessment of valuable operative property assessed by local assessors.

| Year. | State Board Assessment. | | Average Tax Rate. | Ad Valorem Tax Would Have Been. | Gross Receipts Tax Was. |
|---|---|---|---|---|---|
| 1911 | $2,995,760 | [1] | $2.53 | $75.793 | $57,159.08 |
| 1912 | 3,070,654 | [2] | 2.53 | 77.687 | 58,619.98 |
| 1913 | 3,270,246 | [3] | 2.55 | 83.391 | 83,243.66 |
| 1914 | 3,459,920 | [4] | 2.90 | 100.338 | 88,056.06 |
| 1915 | 2,913,253 | [5] | 2.91 | 84.778 | 73,209.40 |
| 1916 | 3,548,023 | [6] | 2.824 | 100.196 | 82,115.94 |

[1] State Board of Equalization special report of 1912.

[2] State Board of Equalization special report of 1912.

[3] State Board of Equalization special report of 1912, revised by special committee of 1915.

[4] Estimated on basis report of Tax Commission of 1915–17.

[5] Report of Tax Commission, 1915–17.

[6] Report of Tax Commission, 1915–17."

The foregoing tables will make it clear that the plaintiff has not been unfairly treated by the state, although it is well to note that the plaintiff in its complaints herein does not raise the issue of overvaluation and makes no allegation of excessive tax as compared with the value of property taxed. The valuations presented in plaintiff's argument were all derived from the work of the officers of the state, and the figures are only relevant as showing that the state system of taxation was based in fact, as well as in name, upon the value of plaintiff's property in the state, and as further illustrating that interstate commerce carriers have not been made to bear an undue proportion of the burden of taxation.

In view of our conclusion on this branch of the case it will be unnecessary to consider or determine the extent to

which the taxing power of the state may be exercised in the event that the burden upon the property of interstate commerce carriers is out of all reasonable proportion to that im-' posed upon the property of others within the state.

[6]   We cannot see that the validity of that portion of the act (Stats. 1911, pp. 530, 548, sec. 24), declaring a forfeiture of the right of a foreign corporation to do business in the state if taxes are not paid, is involved in this action to recover taxes already paid.

Judgment affirmed.

Olney, J., Sloane, J., Shaw, J., Angellotti, C. J., Lennon, J., and Lawlor, J., concurred.