[Civ. No. 1072. Fourth Appellate District.—July 3, 1934.]

MARTHA SUTHERLAND, as Administratrix, etc., Respondent, v. SAN DIEGO ELECTRIC RAILWAY COMPANY (a Corporation), Appellant.

Morrison, Hohfeld, Foerster, Shuman & Clark for Appellant.

A. Haines, Arthur F. H. Wright and Gray, Cary, Ames & Driscoll for Respondent.

BARNARD, P. J.—Fred A. Sutherland operated seven automobile bus lines, having his headquarters at San Diego. On September 20, 1929, he entered into a written contract with the San Diego Electric Railway Company, a corporation, under which he agreed to sell and the railway company agreed to buy the operative rights to three of these automobile bus lines, together with all franchises, permits, licenses, easements and goodwill pertaining thereto, with a few benches and stop signs. Sutherland retained the other lines theretofore operated by him and no automobile

bus equipment or other physical property was to be transferred. A part of the purchase price was to be paid upon approval of the transfer by the railroad commission and the balance upon the taking over of the operation of the three lines by the buyer. The agreement provided that the buyer should have a reasonable time after approval of the transfer by the railroad commission in which to secure new operating equipment with which to conduct the operations of the lines to be taken over. It was also provided that during the interim between the approval of the project by the railroad commission and the taking over of operations by the buyer, the seller was to continue to operate the three lines, retaining all receipts and paying all expenses and cost of operations, including taxes and license fees. The contract then contains a paragraph, a dispute as to the meaning of which has given rise to this controversy, which reads as follows:

"Seller shall pay the gross revenue tax in respect to the operations herein agreed to be sold up to the time when Buyer actually takes over said operations by its own equipment and employees; if Buyer should ever be required to pay any gross revenue tax in respect to any revenue received by Seller and not received by Buyer, Seller agrees to reimburse Buyer the amount of such gross revenue tax; and if Seller should ever be required to pay any gross revenue tax in respect to any revenue received by Buyer and not received by Seller, Buyer agrees to reimburse Seller the amount of such gross revenue tax so paid by Seller."

The buyer took over the operation of the three lines in question on January 10, 1930, and after the first installment of the tax imposed by the provisions of article XIII, section 15, of the Constitution, and section 3664aa of the Political Code, which had become a lien on the first Monday in March, 1929, had been paid. The second installment of this tax was paid by Sutherland in February, 1930. In February, 1930, Sutherland reported to the state his gross receipts from the operation of all seven lines during the calendar year 1929. On the first Monday in March, 1930, the tax for another year became a lien under the constitutional and statutory provisions referred to. Before the first installment thereof was paid, Sutherland requested the rail-

way company to pay the proportion thereof attributable to the three lines which had been taken over by the company. Payment was refused and Sutherland subsequently paid both installments of that tax. He then brought this action to recover a proportion of the tax paid, in connection with the three lines sold, under the assessment which became a lien on the first Monday in March, 1929, covering the period from the date when the buyer took possession to the end of that assessment year, and also to recover the entire tax paid in connection with these lines under the assessment which became a lien on the first Monday in March, 1930. While the action was pending the plaintiff died and his personal representative was substituted as plaintiff. From a judgment in favor of the plaintiff the defendant has taken this appeal and, for convenience, the original plaintiff will be referred to as the respondent.

The facts are not in dispute and the controversy here is as to whether the provisions of the contract, above quoted, obligated the appellant to repay to the respondent a part of the tax on the three lines sold which became a lien on the first Monday in March, 1929, representing a *pro rata* proportion of that tax for the balance of that assessment year, and the entire tax on these three lines which became a lien on the first Monday in March, 1930. In other words, the controversy is as to whether the intention of the parties, as disclosed by their contract, was that the taxes becoming a lien in 1929 and 1930, the amount of which was fixed at four and one-quarter per cent of the gross receipts of these lines for the years 1928 and 1929 respectively, should be paid by the seller, or whether it was their intention that these taxes should, in effect, be prorated and that the buyer should pay such taxes as applied to the lines sold, from and after the time it took possession.

In practical effect, the appellant treats the tax which became a lien in March of a given year as a tax on the gross income for the preceding calendar year, and insists that the contract discloses an intention that the seller should pay all of such taxes which became a lien in the years 1929 and 1930, although the tax for the latter year did not exist and did not become a lien until nearly two months after the buyer took possession, and although the first clause of the paragraph in question provided that the seller was

to pay the tax therein referred to only up to the time the buyer took possession.

While the appellant concedes that the first clause of the quoted paragraph lends some support to the respondent's position that the buyer was to pay such proportion of these taxes as may be said to cover the period of time after it took possession of the lines sold, it contends that the second and third clauses of this paragraph, in referring to "gross revenue tax in respect to any revenue received", conclusively disclose the intention of the parties that the one receiving the revenue by which the tax was measured should pay the tax. It is argued that since the revenue for the years 1928 and 1929 was all received by the seller, it could not have been intended that the buyer should repay any part of the taxes which became a lien in March, 1930, since those taxes were "in respect to any revenue received" by the seller and not by the buyer. It is further argued that the only explanation of the second clause is that it was intended to provide for the contingency that the respondent might become insolvent or refuse to pay the tax which became a lien on the first Monday in March, 1930, in which case the appellant might be compelled to pay the tax in order to protect its franchises. The appellant offers no explanation as to the meaning of the third clause. If all of the taxes which became a lien in March, 1929, and in March, 1930, related to the revenues for 1928 and 1929 in the sense contended for by appellant, and not to future revenue during the ensuing year after the tax became a lien, there was no possible tax which the seller might have to pay which related to any revenue which had been received by the buyer, since the seller had received all of the revnue during the years 1928 and 1929. Under that view, the third clause is entirely meaningless.

It is a familiar rule that contracts should be so interpreted, when possible, as to give effect and meaning to all parts thereof. This contract can be so interpreted as not only to give effect to both the second and third clauses of the paragraph, but to avoid any conflict between the second clause and the first clause. The tax affecting the lines sold and the tax affecting the lines retained by the seller, which had become a lien on the first Monday in March, 1929, were tied together in such a manner that neither part could

be paid without paying the other. It was natural for the parties to anticipate that a similar situation would obtain with respect to the tax which would become a lien on the first Monday in March, 1930, since the seller had operated all of the lines together during the year 1929, and might well be expected to make his report to the state covering the receipts for that year as one report. Under these circumstances, the presence of the second and third clauses of the paragraph indicates an intention to provide for a contingency which might easily arise, namely, that either one of the parties might neglect or refuse to pay the tax affecting the lines then being operated by him or it, thus jeopardizing the position of the other party, the tax on whose lines was thus tied up with that on the lines of the defaulting party, in which event either party could pay the entire tax with a right of recovery against the other for his proportion.

 The first clause of the paragraph refers to a gross revenue tax in respect to the operations of the lines sold. While the contract is not happily worded, the reference undoubtedly is to the tax imposed by article XIII, section 15, of the Constitution and section 3664aa of the Political Code. It is well settled that this tax is in the nature of a property tax upon the operative properties in such a business, including the franchise to use the highways. (*Alward* v. *Johnson*, 208 Cal. 359 [281 Pac. 389]; affirmed in 282 U. S. 509 [51 Sup. Ct. 273, 75 L. Ed. 496, 75 A. L. R. 9]; *Pullman* v. *Richardson*, 185 Cal. 484 [197 Pac. 346]; affirmed in 261 U. S. 330 [43 Sup. Ct. 366, 67 L. Ed. 682].) It seems to be thus settled that the form of taxation here in question is not a form of income tax based upon the gross income received during the preceding year, but the gross receipts of the preceding year are taken only as a means of measuring the valuation of the property interests thus taxed. It would seem to follow that this property tax, becoming a lien on the first Monday of March in a given year, is a tax upon said property for the ensuing year, after the tax becomes a lien, rather than a tax for the preceding calendar year which expires more than two months before the tax becomes a lien. While this tax is not well described in the contract now before us, the only reasonable explanation of the language used is that the parties

considered it as a tax for the ensuing year, although based upon the amount of revenue produced in the preceding year.

In the first clause of the quoted paragraph it is plainly agreed that the seller is to pay this tax only up to the time the buyer takes possession. The "gross revenue tax" referred to in the second and third clauses is the same tax mentioned in the first clause and can be no other. Since this tax is not an income tax "in respect to any revenue received" during the preceding calendar year, since the parties definitely agreed that this tax "in respect to the operations herein agreed to be sold" should be paid by the seller "up to the time when Buyer actually takes over said operations", and since it was further agreed that either party might recover any part of the tax he might be required to pay "in respect to any revenue received by" the other, it seems clear that the references in the second and third clauses to any revenue received by the party not paying the tax and not received by the one paying the same, must be to the revenue so received during the ensuing year after the tax becomes a lien and not to the revenue received during the preceding calendar year, the latter not being a direct basis of the tax but being merely a measure of valuation fixed by the Constitution.

The respondent then came within the provisions of the third clause of the paragraph since he had paid the tax, referred to by the parties as the gross revenue tax, which was in respect to the revenue received by the buyer during the time after he took possession, because it related to and was in respect to the operations thereafter conducted by the buyer, and was in respect to the income thereafter received by the buyer, within the meaning and intent of the contract. We think it follows that the respondent paid this tax for the balance of the assessment year beginning in March, 1929, and for the entire assessment year beginning in March, 1930, "in respect to any revenue received by the buyer and not received by the seller" and that, under the provisions of the contract, he was entitled to a return of the tax so paid. This interpretation gives effect to all three clauses of the paragraph, avoids a conflict between the first clause and the second clause, is in accord with the usual and just arrangement whereby, in the case of property sold, a vendor and

vendee pay taxes in proportion to the time each has possession of the property and, in our opinion, is in accord with the meaning of the contract entered into between the parties.

The appellant further contends that in the event these taxes are to be prorated, since the automotive equipment previously used on these three lines was not transferred, any prorating of the tax must take into consideration the respective values of the property transferred and the property retained by the seller, and that the judgment must be reversed and the cause remanded for the purpose of ascertaining these respective values. While the automobile equipment and other physical property in connection with these three lines was not transferred, other equipment was procured and used by the buyer. The tax becoming a lien in March, 1930, covered the new equipment used by the buyer as well as the franchises and other rights. While the tax which became a lien in March, 1929, also covered the equipment then used in operating the lines, as well as the franchises and other rights, and while there may have been a difference in value between the equipment used by the seller prior to the sale and that used by the buyer after taking possession, any such difference in value could not affect the amount of the tax under the measure of valuation fixed by the Constitution. In any event, and perhaps for this reason, the parties have by their contract provided what might be recovered, namely, the amount of tax that was actually paid.

The judgment is affirmed.

Marks, J., concurred.

Jennings, J., being absent, did not participate in this opinion.

A petition for a rehearing of this cause was denied by the District Court of Appeal on August 1, 1934.