[L. A. No. 23564. In Bank. Nov. 25, 1955.]

DE LUZ HOMES, INC. (a Corporation), Respondent, v. COUNTY OF SAN DIEGO, Appellant.

[L. A. No. 23656. In Bank. Nov. 25, 1955.]

DE LUZ HOMES, INC. (a Corporation), Respondent, v. COUNTY OF SAN DIEGO, Appellant.

WIRE MOUNTAIN HOMES, INC. NO. 1 (a Corporation), Respondent, v. COUNTY OF SAN DIEGO, Appellant.

WIRE MOUNTAIN HOMES, INC. NO. 2 (a Corporation), Respondent, v. COUNTY OF SAN DIEGO, Appellant.

James Don Keller, District Attorney and County Counsel, Carroll H. Smith, Deputy County Counsel, Edmund G. Brown, Attorney General, E. G. Benard and James E. Sabine, Deputy Attorneys General, for Appellant.

Joel E. Ogle, County Counsel (Orange County), George F. Holden and Stephen K. Tamura, Deputy County Counsel, as Amici Curiae on behalf of Appellant.

Holbrook, Tarr, Carter & O'Neill, W. Sumner Holbrook, Jr., Francis H. O'Neill, Alexander W. Rutan, Robert A. Oakes and Oakes & Horton for Respondents.

Horton & Foote, Joseph K. Horton, Rex A. McKittrick, Lawler, Felix & Hall, Riley & Hall, Latham & Watkins, Dana Latham, Samuel J. Nunn, Charles P. Lester, Overton, Lyman, Prince & Vermille, Eugene Overton, Allard, Shelton

& O'Connor, Irl D. Brett, Hodge L. Dolle, Head, Jacobs, Corfman & Jacobs, Hill, Farrer & Burrill, Paul, Hastings & Janofsky, S. V. O. Prichard, Gibson, Dunn & Crutcher, Herbert F. Sturdy and Frank L. Mallory as Amici Curiae on behalf of Respondents.

TRAYNOR, J.—Actions to recover taxes, levied against possessory interests in tax exempt land and improvements and paid under protest, were brought against the county of San Diego (Rev. & Tax. Code, §§ 5103, 5138) in 1953 by De Luz Homes and in 1954 by De Luz Homes, Wire Mountain Homes Number 1 and Wire Mountain Homes Number 2. The county appeals from judgments in favor of plaintiffs and from orders remanding the proceedings to the county board of equalization. The 1953 and 1954 actions raise the same substantive question and have been consolidated on appeal.

De Luz Homes is a 562-unit housing project located on land owned by the United States Government at Camp Pendleton, a military installation in San Diego County. The project provides housing for military and civilian personnel stationed at the camp at maximum rentals prescribed by the Federal Housing Administration and the Department of the Navy and was constructed under the provisions of title VIII of the National Housing Act (12 U.S.C.A. §§ 1748-1748h [known as the Wherry Act]) and section 522a of title 34 of the United States Code. Title VIII provides, "In order to assist in relieving the acute shortage of housing which now exists at or in areas adjacent to military installations . . . and to increase the supply of rental housing accommodations available to military and civilian personnel at such installations, the [Federal Housing] Commissioner is authorized . . . to insure mortgages . . . [on] property . . . designated for rent for residential use by civilian or military personnel of the Army, Navy, Marine Corps, or Air Force . . . assigned to duty at the military installation at or in the area of which such property is constructed." (12 U.S.C.A. § 1748b(a), (b)(2); see Senate Report on Military and Naval Installations—Construction, 82d Cong., 1st Sess., Sen. Rep. No. 727.) Section 522a of title 34 of the United States Code authorizes the Secretary of the Navy to lease property under the control of the Department of the Navy whenever it shall be advantageous to the government.

In July, 1952, the United States Government, acting through the Secretary of the Navy, leased a single parcel of

95.22 acres at Camp Pendleton to De Luz Homes, Inc., a Delaware corporation, for a period of 75 years at an annual ground rental of $100. The lease, as amended, states that the Secretary of the Navy has determined that lease of the premises will effectuate the purpose of "erecting, maintaining, and operating thereon a housing project, consisting of approximately 562 units, substantially in accordance with detailed plans and specifications submitted by the Department of the Navy . . . and approved by the Federal Housing Commissioner." In addition to building and equipping the project and paying the ground rental, the lessee is required to obtain mortgage insurance from the Federal Housing Administration, to lease the units at rents specified by the Federal Housing Administration and the Department of the Navy to persons designated by the commanding general of the camp, to maintain the premises for the term of the lease, to provide protection against fire and other losses, and to "pay to the proper authority, when and as the same become due and payable, all taxes, assessments, and similar charges which, at any time during the term of this lease, may be taxed, assessed or imposed upon the Government or upon the Lessee with respect to or upon the leased premises." The government promises to provide "when and as available" fire and police protection on a nonreimbursable basis and has reserved rights of inspection and a right of way to connect the project with the school site adjoining it. The buildings and other improvements erected by De Luz became the property of the United States as they were completed, and all ranges, refrigerators, and other items required by the plans must remain on the premises and will become the property of the United States after the mortgage debt is paid. Under its contract of mortgage insurance with the Federal Housing Administration, the lessee is required to pay an annual insurance premium, to insure the improvements against fire and other losses, and to accumulate a fund for replacing worn-out improvements and equipment. Under the terms of the lease, the lessee must continue to insure and to accumulate a replacement reserve for the remainder of the lease after the mortgage debt is paid. The lease cannot be transferred or assigned by De Luz without written approval of the government, but may be terminated by the government upon 60 days' notice in the event of default by De Luz in the payment of the annual ground rental or accumulation and maintenance of the replacement reserve, or, irrespective of default, after 50 years from execution of the lease.

De Luz, at its sole expense, had 562 housing units constructed in accordance with the plans drawn by the Department of the Navy and installed therein ranges, refrigerators, screens, shades, and other items designated in the plans. Construction of the entire project cost somewhat in excess of $4,516,000, and to finance it De Luz borrowed from the Republic National Bank of Dallas, Texas, approximately $4,600,000, at 5 per cent per year, payable in full 30 days after completion of the project. After the project was completed, De Luz refinanced the loan by borrowing from the First National Bank of Boston approximately $4,516,000, at 4 per cent per year and repayable in fixed annual installments, including interest, of $248,388. The installment payments began on February 1, 1954, and will continue thereafter for 32 years and eight months until 1986. To secure the loan, De Luz gave the bank a mortgage on its leasehold interest and, as required by its lease, purchased a mortgage insurance policy from the Federal Housing Administration.

All net income from subrentals becomes the property of De Luz, and the company estimates that its maximum potential gross income, assuming 100 per cent occupancy, is $552,354 per year. It forecasts, however, that after making a 20 per cent allowance for vacancies and paying $27,967 into the replacement reserve, $251,271 for maintenance and operating expenses, and $248,388 in payment of its loan, it will expend $55,238 annually in excess of income until its mortgage debt is repaid. After 1986, however, when it will have repaid the loan, it expects income to exceed disbursements by $214,762 per year.[1] The Federal Housing Administration estimates that at 100 per cent occupancy De Luz would receive a gross income of $554,980 per year, and that with a 3 per cent vacancy allowance and deductions of $156,401 for operating expenses, $27,967 for accumulation of the replacement reserve, and $38,400 for taxes, but without a deduction for repayment of the loan, De Luz will receive an annual net income of $305,862.

On Monday, July 20, 1953, after the regular assessment period for the tax year 1953-1954 (Rev. & Tax. Code, § 405) and during the period for equalization (Rev. & Tax. Code, § 1603), De Luz appeared by counsel before the Board of

---

[1] In July, 1953, when the project was about 70 per cent completed, De Luz predicted that maximum gross income, after a 10 per cent vacancy allowance, would be $490,482, that disbursements would exceed income by $35,267.08 per year until 1986, and that thereafter, with the loan repaid, annual income would exceed expenses by $235,701.92.

Supervisors of San Diego County sitting as a board of equalization. It stated that De Luz Homes had not been assessed, that it waived the five-day notice to which it was entitled by statute (Rev. & Tax. Code, § 1611), and that it petitioned the board "to add an assessment of a possessory interest to the De Luz Homes . . . the same being exempt property of the United States, and the assessment to be of a possessory interest therein with a full cash value of $40,350.00." The assessor objected, stating that he had not been able to assess De Luz because of insufficient information as to personal property on the premises, that his office had delayed the assessment to give the taxpayer sufficient time to gather information, and that his office had "not had any cooperation from the taxpayer." The board denied the petition by De Luz with the understanding that as soon as the assessor obtained a full statement of personal property the entire assessment would be put on the roll. On July 31, 1953, the assessor entered an assessment of De Luz for the tax year 1953-1954 at a valuation of $86,690 for the possessory interest in land, $487,380 for the possessory interest in improvements, and $61,380 for personal property, and he levied taxes thereon totalling $35,013.29. De Luz filed an application with the board to reduce the assessment (Rev. & Tax. Code, §§ 1604, 1607), and on August 24, 1953, the board held a hearing, received oral and written evidence, and denied the application. De Luz thereupon paid the full amount of the levy, filed a protest contending that $29,738.57 of the tax was excessive and void, and filed an action to recover the allegedly excessive amount and for revaluation of its possessory interest in land and improvements. (Rev. & Tax. Code, § 5138.) The court found that the assessment had not been made during the regular assessment period, that it was not properly an "escape assessment" (Rev. & Tax. Code, § 531), and that it therefore was void. The court also concluded that certain personal property on the premises had been transferred to the United States Government prior to the first Monday in March of 1953 and was not taxable, and that in valuing the possessory interest in land and improvements the assessor had used an illegal method that resulted in a constructively fraudulent tax. The court found, however, that De Luz "expressly waive[d] any objection to said assessment so far as said 'personal property' was concerned . . . [and] at all times herein has conceded an equitable and moral duty to be assessed in the sum of not more than $40,350 for said tax year on its possessory interest in exempt land and improve-

ments and to pay taxes in a total sum of $1,892.68 therein.'' The court ordered the board of equalization to reconvene, to take new evidence of value, to recompute the value of the possessory interest in accord with the formula offered by De Luz, and to enter such value on the tax roll in lieu of the value entered by the assessor, provided that no amount less than $40,350 be entered.

During the next regular assessment period for the tax year 1954-1955, the assessor valued the possessory interest of De Luz Homes in land at $108,909 and in improvements at $896,518, resulting in a total valuation of $1,005,427, and levied a tax thereon of $50,372.04. An application for reduction of the valuation and the tax thereon was filed with the board of equalization and denied. (Rev. & Tax. Code, §§ 1605, 1607.) De Luz paid the tax under protest, filed a claim for refund with the board of supervisors (Rev. & Tax. Code, § 5096), and, after its denial, filed an action in the superior court to recover the taxes. (Rev. & Tax. Code, § 5103.)

Wire Mountain Homes Number 1 and Wire Mountain Homes Number 2 also are housing units for military and civilian personnel assigned to duty at military bases in San Diego County. As in the case of De Luz Homes, they are located on land leased from the federal government, were constructed pursuant to title VIII of the National Housing Act (12 U.S.C.A. §§ 1748-1748h), were financed by loans secured by mortgages insured by the Federal Housing Administration, and are subleased at rents prescribed by the Federal Housing Administration and the Department of the Navy. Until 1986, when the mortgage loan will have been repaid, annual disbursements, including debt repayment, are expected to exceed income from subrentals and thereafter income is expected substantially to exceed disbursements. For the tax year 1954-1955 the assessor valued the possessory interests of the Wire Mountain projects by the same method used for De Luz Homes. Wire Mountain Homes paid the taxes levied on the possessory interests under protest, filed claims for refund with the board of supervisors, and, after the claims were denied, filed actions for recovery of the amounts paid.

The 1954 actions by De Luz and Wire Mountain Homes were consolidated for trial, and the court found that the value of each of the possessory interests was zero, that the method of valuation used by the assessor was improper, and that the tax based on such method constituted constructive

fraud. As in the 1953 action by De Luz, the court ordered the board of equalization to reconvene, to take new evidence of value, to recompute the value of the possessory interests by a method specified by the court, and to order the assessor to enter the new assessment on the tax roll in lieu of the amount previously approved by the board. The court retained jurisdiction to review the proceedings of the board and to make such further orders, findings of fact, and judgments, including repayment of taxes (Rev. & Tax. Code, § 5141), as might be necessary.

In the method of valuation employed by the assessor, the fee value of the land is estimated "by the same methods and approaches to value that [are used in assessing] all other taxable land in the county, similarly situated and of a similar nature." A percentage of the amount so estimated is deducted as an allowance for restrictions on the use of the property imposed by the lease, and to the difference, known as the base value, is imputed an income equal to a reasonable rate of return on the base value. In the case of De Luz, the assessor found the reasonable rate of return to be 6 per cent, and he added an additional 2 per cent for taxes. The percentage representing reasonable income and taxes, known as the "economic rental" of the leasehold, was translated into numerical figures from each of the leaseholds, and from it was deducted the lessee's rent to the government, a nominal amount of $100 reduced to $35 to allow for the ratio of assessment value to market value normally used by the assessor. The difference between the imputed income and the rent charged by the government, known as the lessee's "equity" or "bonus value" in the leasehold, was capitalized at the rate of 8 per cent for the remaining years of the lease, and the amount so computed was deemed the present value of the lessee's equity. A safety factor for overlooked burdens was deducted from it, and the remaining amount was entered on the tax roll as the value of the possessory interest in the government-owned land. The improvements were valued in an essentially identical manner: Their value was estimated as if they were owned in fee; percentage deductions were made for depreciation and restrictions on use imposed by the lease; an "economic rental" of 8 per cent was imputed to the difference. Since the government charges no rent for the improvements, the "economic rental" equaled the lessee's "equity," and its present value, when capitalized at 8 per cent for the remaining years of the lease and reduced by

a safety factor for undiscovered burdens, was deemed the taxable value of the improvements.

Concluding that this method failed to take annual benefits and burdens into account and therefore was improper, the court directed the board of equalization to take evidence on expected annual gross income, expected annual operating expenses, the rate of capitalization that would allow for ad valorem taxes, the amount of money that plaintiffs had invested in their leaseholds, and the annual sum required to amortize their investments together with interest thereon at 6 per cent. The board was ordered to compute the value of the possessory interests by using actual expected net income, rather than imputed income. It was directed to deduct annual operating expenses and amortization from annual gross income, to capitalize the difference for 52 years at a rate equal to 6 per cent plus an appropriate allowance for taxes, to reduce the amount so computed to 35 per cent thereof to allow for the "proper" ratio of assessed value to market value, and to enter the net result on the tax roll as the value of the possessory interests in the leaseholds.

In addition to remanding the proceedings to the board, the court made specific findings as to the values of the possessory interests for the tax years 1953-1954 and 1954-1955. It found the possessory interest of De Luz to have a total value in 1953, for both land and improvements, of $7,700, as opposed to the assessor's total valuation of $574,070, and in 1954 it found that each of the possessory interests had a value of zero, as compared with estimates by the assessor of $1,005,427 for De Luz, $112,440 for Wire Mountain Homes Number 1, and $129,750 for Wire Mountain Homes Number 2. In reaching these results, the court employed a method of valuation different from that which it ordered the board to follow. It deducted "annual burdens" (total annual disbursements, including operating expenses, payments into the replacement reserve, and payments of principal and interest on the mortgage debts) from "annual benefits" (annual gross income), and found that until 1986, when the debts will have been repaid, annual burdens will exceed annual benefits, and that thereafter annual benefits will exceed burdens. Capitalizing the expected excess of burdens over benefits and the expected excess of benefits over burdens over a period of 52 years, the court found that the capitalized value of net burdens exceeded the capitalized value of net benefits. It interpreted this result to mean that the present value of

future income from the leaseholds was less than zero, and that therefore the possessory interests have no value at this time. In the case of De Luz, for example, it found that "burdens" will exceed "benefits" by \$55,238 per year until 1986, and that "benefits" will exceed "burdens" thereafter by \$214,762 per year. It computed the present value of \$55,238 per year for 32 years commencing in 1954 as \$1,043,813 and the present value of \$214,762 per year for 19 years commencing in 1986 as \$218,474. Subtracting the present worth of net "benefits" from the present worth of net "burdens," it obtained a figure of \$825,339. It interpreted this figure to mean that the present value of expenditures was greater than the present value of profits, and that therefore De Luz had no taxable value at the time of assessment. The county contends that the 1953 assessment of De Luz was timely, that the method of valuation employed by its assessor is valid, and that the values of the leaseholds as found by the assessor and approved by the board of equalization are correct.

### Timeliness of the 1953 Assessment of De Luz Homes

■ "If any property belonging on the local roll has escaped assessment, the assessor shall assess the property on discovery at its value on the lien date for the year for which it escaped assessment . . ." (Rev. & Tax. Code, § 531.) Thus, when property is not assessed between the first Mondays in March and July for any tax year, the assessor is required to assess it when he discovers its physical existence, its taxable status (see *Imperial Irr. Dist.* v. *County of Riverside*, 96 Cal.App.2d 402, 407 [215 P.2d 518]), or the fact that it has not been assessed. (*Carpenter* v. *Pacific Coast Ins. Assn.*, 10 Cal.2d 304, 306 [74 P.2d 511].) ■ Only if a delayed assessment were caused by the assessor's negligence and would cause substantial injury to the taxpayer has it been suggested that such assessment may be improper. (See *Carpenter* v. *Pacific Coast Ins. Assn., supra*, 10 Cal.2d 304, 306.) In the present case, however, there is no indication either that the assessor was negligent or that De Luz acted to its detriment in reliance on the fact that it was not assessed during the regular assessment period. Instead, the record discloses that De Luz appeared before the board of equalization on the third Monday in July of 1953 and asked that it be assessed at figures it supplied. The assessor appeared in opposition to the petition and stated that he had insufficient information properly to assess De Luz Homes at that time,

that he had attempted to cooperate with the taxpayer, and that the taxpayer had given him conflicting information about personal property on the premises. The board passed a motion authorizing the assessor to enter an assessment as soon as he secured sufficient information. It is contended that this authorization was improperly granted because it was not preceded by five days' notice as required by section 1611 of the Revenue and Taxation Code. That section provides: "After five days succeeding the time when notice of the date when the matter will be investigated is sent by the clerk of the county board to all persons interested, the county board may direct the assessor to: (a) Assess any taxable property other than State assessed property that has escaped assessment." When both De Luz and the assessor appeared before the board on the third Monday in July and argued, respectively, that an immediate assessment should be made and that assessment should be delayed, the matter was "investigated" within the meaning of the statute, and neither De Luz nor the assessor can now complain that they did not receive five days' notice of the meeting. De Luz, moreover, specifically waived notice and requested immediate assessment at the valuations it offered. Since the board could have concluded that the assessor had not had sufficient information to make an assessment up to the time of the hearing, and since there is no evidence that the board acted arbitrarily or abused its discretion, its directions to the assessor cannot be set aside. (*McClelland* v. *Board of Supervisors,* 30 Cal.2d 124, 129 [180 P.2d 676]; *Los Angeles etc. Co.* v. *County of Los Angeles,* 162 Cal. 164, 170 [121 P. 384, 9 A.L.R. 1277]; *Utah Const. Co.* v. *Richardson,* 187 Cal. 649, 655 [203 P. 401]; *cf., Universal Consol. Oil Co.* v. *Byram,* 25 Cal.2d 353, 356, 357 [153 P.2d 746].) The assessor entered his assessment without further notice to De Luz on July 31, 1953, and since neither the order of the board nor any statute required such notice, and since the assessment was made in accord with the directions of the board, it was validly entered on the tax roll.

### The Valuation of Possessory Interests in Tax Exempt Property

 The standard of valuation prescribed by the Legislature is that, "[A]ll taxable property shall be assessed at its full cash value." (Rev. & Tax. Code, § 401.) "Full cash value," as defined in section 110 of the Revenue and Taxation Code, "means the amount at which property would be taken in payment of a just debt from a solvent debtor." (It pro-

vides, in other words, for an assessment at the price that property would bring to its owner if it were offered for sale on an open market under conditions in which neither buyer nor seller could take advantage of the exigencies of the other. It is a measure of desirability translated into money amounts (see Brandeis, J., concurring in *Missouri ex rel. Southwestern Bell Tel. Co.* v. *Public Service Com.*, 262 U.S. 276, 310 [43 S.Ct. 544, 67 L.Ed. 981]), and might be called the market value of property for use in its present condition. Indeed, section 401 of the Revenue and Taxation Code as originally enacted (Pol. Code, § 3627) contained the words "market value" as the standard for valuation of the stock of domestic corporations, and after "market value" was deleted in 1881 (Stats., 1881, ch. LIII, p. 57), this court stated that the term had been synonymous with "full cash value." (*Crocker* v. *Scott*, 149 Cal. 575, 585 [87 P. 102] ; see also *San Francisco Nat. Bank* v. *Dodge,* 197 U.S. 70, 79 [25 S.Ct. 384, 49 L.Ed 669].)

■ This standard of value must be used in the assessment of all taxable property, for the Constitution of California states, "All property in the State except as otherwise in this Constitution provided, not exempt under the laws of the United States, shall be taxed in proportion to its value, to be ascertained as provided by law, or as hereinafter provided." (Art. XIII, § 1.) ■ The Constitution requires not only that all nonexempt property be taxed (*Chesebrough* v. *City & County of San Francisco,* 153 Cal. 559, 568-569 [96 P. 288] ; *Crocker* v. *Scott,* 149 Cal. 575, 585 [87 P. 102]), but that except as otherwise specified all property be assessed by the same standard of valuation. (*Mahoney* v. *City of San Diego,* 198 Cal. 388, 398, 403 [245 P. 189] ; *Wilson* v. *County of Sutter,* 47 Cal. 91, 92 [construing substantially similar provision in Const. 1848, art. XI, § 13].) Thus, it was held reversible error for a board of equalization to value one type of property at the price it would bring as salvage while valuing other property at the price it would bring in its present use and condition. (*Mahoney* v. *City of San Diego, supra,* 198 Cal. 388, 400-402.)

■ Since nonexempt possessory interests in land and improvements, such as the leasehold estates involved in the present actions,[2] are taxable property (Rev. & Tax. Code,

---

[2]The possessory interest is admittedly taxable in the hands of the present lessees, and would be taxable even if they defaulted and the leaseholds were assumed by the Federal Housing Commissioner. (12 U.S.C.A. § 1748f.)

§§ 201, 104, 107; *Parr-Richmond Industrial Corp.* v. *Boyd,* 43 Cal.2d 157, 164 [272 P.2d 16]; *Kaiser Co.* v. *Reid,* 30 Cal.2d 610, 618 [184 P.2d 879]; see *Delaney* v. *Lowrey,* 25 Cal.2d 561, 564 [154 P.2d 674]), they too must be assessed at "full cash value." ▮ In practice, assessors usually enter the entire value of land and improvements on the tax roll without distinction between possessory and reversionary interests, and since this practice results in a single amount reflecting both interests on the roll, the constitutional mandate that all property be taxed is obeyed. (*San Pedro, etc. R. R. Co.* v. *City of Los Angeles,* 180 Cal. 18, 22 [179 P. 393].) ▮ As between reversioners and possessors payment of the tax is a private arrangement. (*Simms* v. *County of Los Angeles,* 35 Cal.2d 303, 313 [217 P.2d 936]; *San Pedro, etc. R. R. Co.* v. *City of Los Angeles, supra,* 180 Cal. 18, 22; *Lick* v. *Austin,* 43 Cal. 590, 594-596.) ▮ When, however, the possessory interest is taxable and the reversion is exempt, only the possessory interest is subject to assessment and taxation. (*Pasadena* v. *County of Los Angeles,* 182 Cal. 171, 176 [187 P. 418]; *People* v. *Shearer,* 30 Cal. 645, 661.) "When . . . there is a lease of land owned by the state or a municipality, the reversion being exempt from taxation, the usufructuary interest alone is subject to tax in proportion to its value; and in the absence of agreement to the contrary, the tax necessarily falls upon the lessee." (*Hammond Lbr. Co.* v. *County of Los Angeles,* 104 Cal.App. 235, 240 [285 P. 896].) ▮ Since the possessory interest must be assessed in accord with the standard of valuation applicable to all other property, its estimated value is the price it would bring if offered on an open market under conditions in which neither buyer nor seller could take advantage of the exigencies of the other, and this hypothetical market price is its value even though a sale of the property has not been made or contemplated. ▮ It is well settled that "the absence of an 'actual market' for a particular type of property does not mean that it has no value or that it may escape from the constitutional mandate that 'all property . . . shall be taxed in proportion to its value' (Art. XIII, § 1) but only that the assessor must then use such pertinent factors as replacement costs and income analyses for determining 'valuation.' " (*Kaiser Co.* v. *Reid,* 30 Cal.2d 610, 623 [184 P.2d 879].) ▮ Assessors generally estimate value by analyzing market data on sales of similar property, replacement costs,

and income from the property (see 1 Bonbright, Valuation of Property, pp. 113-266; American Institute of Real Estate Appraisers, The Appraisal of Real Estate, pp. 75-85; Fisher, Real Estate in California, p. 157), and since no one of these methods alone can be used to estimate the value of all property, the assessor, subject to requirements of fairness and uniformity, may exercise his discretion in using one or more of them. (*Utah Const. Co.* v. *Richardson,* 187 Cal. 649, 652-653 [203 P. 401]; *Southern Calif. Tel. Co.* v. *County of Los Angeles,* 45 Cal.App.2d 111, 116-118 [113 P.2d 773].)

■ The assessing authority's estimate of the value of specific property at a specific time is reviewed by the board of equalization at the request of the taxpayer (Rev. & Tax. Code, §§ 1601-1615), and the board's decision in regard to specific valuations and the methods of valuation employed are equivalent to the findings and judgment of a trial court and reviewable only for arbitrariness, abuse of discretion, or failure to follow the standards prescribed by the Legislature. (*McClelland* v. *Board of Supervisors, supra,* 30 Cal.2d 124, 129; *Universal Consol. Oil Co.* v. *Byram, supra,* 25 Cal.2d 353, 356; *Miller & Lux, Inc.* v. *Richardson,* 182 Cal. 115, 128 [187 P. 411]; *Los Angeles etc. Co.* v. *County of Los Angeles, supra,* 162 Cal. 164, 168.)

■ In the present case, the assessor purported to value the leaseholds by the capitalization of income method, a generally accepted method of valuing property from which income may be or is derived. (*Kaiser Co.* v. *Reid,* 30 Cal.2d 610, 623 [184 P.2d 879]; *Pullman Co.* v. *Richardson,* 185 Cal. 484, 496 [197 P. 346]; *Alpaugh Irr. Dist.* v. *County of Kern,* 113 Cal.App.2d 286, 293 [248 P.2d 117]; *Birch* v. *County of Orange,* 59 Cal.App. 133, 138 [210 P. 57]; *H. & W. Pierce, Inc.* v. *County of Santa Barbara,* 40 Cal.App. 302, 306 [180 P. 641]; see *Wild Goose C. Club* v. *County of Butte,* 60 Cal. App. 339, 341 [212 P. 711].) According to this method, the value of property is the sum of anticipated future installments of net income from the property, less an allowance for interest and the risk of partial or no receipt. (See American Institute of Real Estate Appraisers, The Appraisal of Real Estate, chs. 17, 18; Babcock, The Valuation of Real Estate, pp. 39, 127-129; 1 Bonbright, The Valuation of Property, ch. XI.) "[I]t involves a capitalization or discounted valuation of the realized or prospective net monetary income derivable by continuous exploitation rather than by resale." (1 Bonbright, op. cit. *supra,* p. 230.) ■ The first step in

the process is to determine prospective net income and this is done by estimating future gross income and deducting therefrom expected necessary expenses incident to maintenance and operation of the property. In instances in which future income cannot be estimated with reasonable accuracy or is not ascribable entirely to the property, prospective net monetary income is imputed in an amount equal to a minimum reasonable return on estimated market value. (See *Kaiser Co.* v. *Reid*, 30 Cal.2d 610, 623 [184 P.2d 879].)

Since it is generally accepted that a person who agrees to receive payment in the future is entitled to interest both for waiting and the risk of partial or no receipt, the second step is to discount each future installment of income by a rate of interest that takes into account the hazards of the investment and the accepted concepts of a "fair return." The sum of the discounted installments is the present value of the property.[3] An apt example of determining the value of property by the capitalization of net income method is given by counsel in a companion case: Assume that the most effective use that may be made of an item of property is the rental thereof, that the property may be rented for a period of three years (at the end of which it will be worthless) for a gross rental of $120 a year, to be paid at the end of the year, that the expenses, e.g., repairs, of the lessor incident to the property will be $20 a year, also to be paid at the end of the year, and that a 6 per cent rate of return is appropriate to the amount of risk involved to the lessor. The value of the property will be determined as follows:

```
Annual gross income...........................$120.00
Annual expense ............................ 20.00
 Annual net income....................$100.00
Present worth of $100 to be received:
 1 year in the future ($100 x .9434)[4]...$94.34
 2 years in the future ($100 x .89)[4].... 89.00
 3 years in the future ($100 x .8396)[4].. 83.96
 Value of property.....................$267.30
```

[3]In practice, the present value of an amount to be received in regular future installments is computed by multiplying the annual amount by a present value factor that reflects interest, risk, and, if applicable, a decline in income in later years. (See American Institute of Real Estate Appraisers, The Appraisal of Real Estate, Appendix, tables I-IX; Finney, Principles of Accounting, [3d ed.] ch. 10; Schmutz, Condemnation Appraisal Handbook, ch. 9.)

[4]The coefficients for a 6 per cent return were taken from a standard discount table printed in Babcock, Valuation of Real Estate, p. 538.

In valuing property, the assessor must adhere to the statutory standard of "full cash value," and must therefore estimate the price the property would bring on an open market under conditions in which neither buyer nor seller could take advantage of the exigencies of the other. The net earnings to be capitalized, therefore, are not those of the present owner of the property, but those that would be anticipated by a prospective purchaser. "Anticipated future earning power is the *sole* matter of consequence, since reported earnings are already water under the mill." (Bonbright, op. cit. *supra*, p. 229; see also Babcock, op. cit. *supra*, pp. 229-230.) The present owner may have invested well or poorly, may have contracted to pay very high or very low rent, and may have built expensive improvements or none at all. To value property by capitalizing his anticipated net earnings would make the value of property equal to the present value of his profits; since, however, the legislative standard of value is "full cash value," it is clear that whatever may be the rationale of the property tax, it is not the profitableness of property to its present owner. If a purchaser would buy a given property on an open market, the property has a value equal to the price such purchaser might be expected to pay.

The standard of "full cash value" applies equally to a leasehold interest. Accordingly, the assessor must estimate the price a leasehold would bring on an open market under conditions in which neither buyer nor seller could take advantage of the exigencies of the other. He must therefore capitalize, not the anticipated net earnings of the present lessee, but those of a prospective assignee. To a prospective assignee, anticipated net earnings equal expected gross income less necessary expenditures for maintenance, operation, and taxes.[5] No deduction is made for the cost of the lease to the present lessee, i.e., his charges for rent and amortization of improvements, for to a prospective assignee the value of a leasehold is measured solely by anticipated gross income less expected necessary expenditures.

In *Blinn Lbr. Co.* v. *County of Los Angeles*, 216 Cal. 474, 481 [14 P.2d 512], this court stated that a person

[5] Although taxes are themselves based on value, the tax rate is known, and therefore an allowance for taxes can be expressed as a percentage of the value to be found. In practice, an allowance for taxes is usually made as an addition to the capitalization rate and is reflected in the present worth factor. (See 1 Bonbright, The Valuation of Property, p. 257.)

who has assumed a lease will deduct from his annual income statement an aliquot portion of the price he paid to acquire the lease and of the cost of improvements that he installed. Such practice is in accord with generally accepted principles of accounting to determine the net income and net worth of the present owner. (See Finney, op. cit. *supra,* chs. 11, 12.) By allocating past costs to present and future income, the income recipient apportions expenditures for long-term benefits to each revenue period in which some of the benefit is realized. The remaining unamortized cost appears on the balance sheet as an asset valued at cost less the amounts already charged to income. (See Finney, op. cit. *supra,* pp. 192, 207; 2 Bonbright, op. cit. *supra,* p. 894 et seq.) Although this procedure is sound accounting practice to determine the net income and net worth of the present owner, it will not reflect the "full cash value" of the property. The accountant deals with past historical cost to the present owner and by the process of amortization spreads the cost of property over its useful life. (Babcock, op. cit. *supra,* pp. 402-403.) The unamortized cost reflected on the balance sheet has no relation to the "full cash value," i.e., the price that a willing buyer would pay a willing seller.

Furthermore, in determining the income to be capitalized to establish value for appraisal purposes, no deduction can be made for amortization. (Fisher, Nature of Capital and Income, pp. 238, 255.) "[N]o concept of income which includes . . . depreciation in capital value as a positive or negative item of income, is acceptable as a basis of valuation under the 'capitalized-income' method." (Bonbright, op. cit. *supra,* p. 910 citing Fisher.) "[I]n valuation, net earnings are net 'before depreciation,' *i.e.,* net earnings are a combination of income and capital returns and are computed as the actual difference between the 'puts' and 'takes.' Appraising presupposes a purchaser, and the valuation is made at a figure which the net earnings can support including a return of capital equal to the successive losses of value expected in the depreciation of the property. Since the value is the end and object of valuation, the process cannot include an expense item based upon the answer." (Babcock, op. cit. *supra,* p. 420.) Rent paid for a leasehold interest, like the cost of improvements that revert to the lessor, is part of the cost or purchase price of the leasehold, and to include a deduction for it, is likewise to include an item of expense based on the answer, i.e., the value of the property.

Thus, it would not only be anomalous to deduct any part of that value, the very answer sought, from the income that is to be capitalized to obtain that answer, it would be a duplication, for the interest rate applied in capitalizing net income provides for a return of capital value as well as interest. (American Institute of Real Estate Appraisers, The Appraisal of Real Estate, p. 321; *ibid.*, p. 214; Babcock, op. cit. *supra,* p. 230; see example given below.[6])

It is apparent, therefore, that in requiring the assessor to deduct the present lessee's charges for rent and amortization from estimated gross income the court in the Blinn case confused income for accounting purposes with income for appraisal purposes.[6] Moreover, there will be no "waste of capital" as feared by the court in the Blinn case (216 Cal. at 478) when the purchaser's cost equals the capital value of the property.[7] If the cost exceeds this value, then there is a wastage of capital, but only at the time of purchase and it is properly disregarded by persons valuing property in terms of future income.

To deduct amortization charges of the present lessee not only is to subtract a part of the very figure that is being determined, the value of the property, from the elements of the computation, but is to reach a valuation of zero in every

[6]The Blinn case also erred in ordering that actual rent and amortization be deducted from imputed gross income without making an adequate distinction between imputed gross and imputed net income. An imputed gross income must be sufficiently large to allow for expenditures and therefore must exceed the minimum reasonable return on an investment. The court in Blinn, however, deducted actual rental and amortization charges from an imputed gross income of 6 per cent of the fee value of the leased land, and also used 6 per cent as the rate of capitalization. (216 Cal. at p. 479.) It can hardly be assumed, however, that the same percentage that reasonably reflected the risk and interest incident to capitalizing net income was sufficient to serve as a basis for the deduction of the lessee's charges.

[7]That this capital value will be restored to the purchaser through operation of the capitalization of income method may be demonstrated by continuing the example above, p. 593. If a purchaser buys the property for the capitalized value of $267.30, he will receive each year a return of capital and interest as follows:

| Year | Net Amount Rec'd | Interest at 6 Per Cent Unrecovered Capital Value | Annual Partial Return of Capital Value | Amount of Capital Value Unrecovered at End of Year |
|---|---|---|---|---|
| 1st | $100 | $16.04 ($267.30x.06) | $83.96 ($100-16.04) | $183.34 ($267.30-83.96) |
| 2d | 100 | 11.00 ( 183.34x.06) | 89.00 ( 100-11.00) | 94.34 ( 183.34-89.00) |
| 3d | 100 | 5.66 ( 94.34x.06) | 94.34 ( 100- 5.66) | 0 ( 94.34-94.34) |
| | | Total capital value returned $267.30 | | |

Thus, the value determined by applying the capitalization rate to net income, exclusive of amortization, results in no waste of capital, for the annual net receipts result in a complete return of the original capital of $267.30 plus interest at the rate of 6 per cent on the unrecovered value remaining at the end of each year.

case in which the lessee had estimated future earnings correctly and had invested their present value in the leasehold.[8] Under such circumstances, the lessee, although paying no property taxes would recover the full amount of his investment plus interest over the life of the lease (see example, *supra*). Thus, in the case of De Luz, the Federal Housing Administration estimates that annual net income, after deducting operating expenses, the required contribution to the replacement reserve, and taxes, will be $305,862 per year. The present value of the right to receive that amount for the period of the lease, 75 years, is $5,033,255, when capitalized at 6 per cent. If, however, an annual deduction of $274,279 is made from gross income to allow for recoupment of the lessee's investment at 6 per cent,[9] annual income is but $31,583 per year, with a present value of $393,555. According to the estimates of De Luz, annual net income, except for amortization of its investment and taxes, will be $162,645 per year, which has a present value of $2,026,719 at 8 per cent. If amorization is deducted, the net income is a negative figure, and the leasehold has a value of zero. There is no doubt, however, that the right to receive $162,645 per year for 75 years has a value equal to the sum of the amounts to be received less a discount for risk and interest. De Luz invested approximately $4,516,000 to receive the annual income from the lease, and in reliance on its receipt the First National Bank of Boston loaned the principal of the investment and the Federal Housing Administration insured the loan. In the light of these facts, to hold that the leasehold has a value of zero would require a unique concept of value for purposes of taxation entirely different from that used in the ordinary course of business. ▆▆▆ Statements in the Blinn

---

[8]Thus, using the figures of the previous example, a deduction for amortization of the investment in the property in estimating future net income gives the following absurd result:

"Annual income ............................... $120.00
 Annual expense
 "(a) Repairs .........................$ 20
 (b) Amortization of cost in equal annual
 payments over 3 years with 6% interest on unrecovered cost.......... 100

"Net income to be capitalized ....................$000.00
 Value determined by capitalization of income..... . $000.00"

[9]The amount is predicated on the compound interest, equal yearly installments, and declining income assumptions of the Inwood Coefficient. (See American Institute of Real Estate Appraisers, The Appraisal of Real Estate, Appendix, Table III.)

cases (216 Cal. 474, 478-482; 216 Cal. 468, 472-473) requiring the assessing authorities to deduct the present lessee's charges to rent and amortization from expected gross income when valuing possessory interests by an analysis of anticipated earning power are therefore disapproved.[10]

It is contended that the value of the leaseholds, when no deduction from income is made for amortization and rent, will approach the estimated fee values of the land and improvements. Since it is conceivable that the "full cash value" of a long-term possessory interest may approach the value of the fee, near equality between the two estimated values would not of itself demonstrate invalidity in the valuation of either one. Nor does near equality of the leasehold values to those of the fee constitute a violation of the immunity of the federal government from taxation by the states. Since the tax is imposed solely on the privately owned possessory interest of the lessee. (Rev. & Tax. Code, §§ 201, 104, 107), and under the terms of the contract between the federal government and the lessee will be paid entirely by the lessee (see also 12 U.S.C.A. § 1748f), neither its legal nor economic incidence falls on the federal government. (See *Wilson* v. *Cook*, 327 U.S. 474, 483 [66 S.Ct. 663, 90 L.Ed. 793]; *S.R.A. Inc.* v. *Minnesota*, 327 U.S. 558, 569 [66 S.Ct. 749, 90 L.Ed. 851]; *Oklahoma Tax Com.* v. *Texas Co.*, 336 U.S. 342, 364 [69 S.Ct. 561, 93 L.Ed. 721]; *Alabama* v. *King & Boozer*, 314 U.S. 1, 9-14 [62 S.Ct. 43, 86 L.Ed. 3, 140 A.L.R. 615]; cf. *Society for Savings in Cleveland* v. *Bowers*, 349 U.S. 143 [75 S.Ct. 607, 610, 99 L.Ed. 950].)

In determining the value of the leasehold, the assessor imputed an income of 6 per cent and taxes of 2 per cent to an amount somewhat less than the estimated fee value of the land and improvements, deducted the $100 rent paid to the government therefrom, and capitalized the difference at 8 per cent. This method is erroneous in several respects. First, the deduction from imputed income of the $100 rent paid to the government substitutes valuation according to the profitableness of the property to its present owner for the statutory

---

[10]In *Hammond Lbr. Co.* v. *County of Los Angeles*, 104 Cal.App. 235 [285 P. 896], the District Court of Appeal, in affirming a judgment denying recovery of taxes on a possessory interest, explained a method of valuation that deducted the lessee's rent from imputed gross income and that was presented in evidence to the county board of supervisors by the assessing authorities. (104 Cal.App. at p. 244.) That method did not control the decision of the court in the Hammond case (see especially 104 Cal.App. at p. 246), and it should not be inferred that it now controls assessing authorities.

standard of "full cash value." As pointed out above, the price that a leasehold would command on an open market under conditions in which neither buyer nor seller could take advantage of the exigencies of the other is based on expected future net income from the leasehold without regard to rent paid by the present lessee. Second, no adequate distinction is made between imputed gross income and imputed net income. An imputed gross income would have to be sufficiently large to allow for deduction of anticipated necessary expenses incident to operating and maintaining the project, but no deduction for these items, either actual or imputed, is made. Imputed net income would equal the minimum reasonable return on the investment, but the assessor's method deducts the $100 rent to be paid the government, and thereby reduces imputed income to a rate of return less than the rate of capitalization.

The value of the leaseholds involved in the present case can be estimated more accurately by capitalizing expected future actual net income instead of an imputed income. According to the imputed income analysis used by the assessor, the value of the leaseholds was deemed to be equal to the present value of an income imputed to the "base value" of the leaseholds, the "base value" being equal to the estimated value of the fee less a deduction for "burdens and restrictions of the lease." The initial step in the computation, an estimation of the fee value of the land and improvements "by the same methods and approaches to value that [are used in assessing] all other taxable land in the county, similarly situated and of a similar nature," necessitates an assumption that land and improvements located in a military installation and devoted solely to housing designated persons at rents regulated by the government · can be said to be "similarly situated and of a similar nature" to privately owned lands and improvements in the county, even though great differences exist in geographic location, expected stability of income, and the range of uses for which the properties are available. The second step in the assessor's computation was to deduct a "restriction percentage for limitations on the use prescribed by the lease," the amount "depending upon the burdens and restrictions of the lease," but there is no indication either that the percentage deducted is an adequate or proper measure of such limitations, or that the lease in fact imposes any burdens on the fee, for it is doubtful that the land would promise the substantial income that it now does

were it not for the assurance of continued occupancy by military personnel provided by the lease. (See *Meade Heights, Inc.* v. *State Tax Com. of Md.,* 202 Md. 20, 31 [95 A.2d 280].) After deducting an allowance for limitations, the assessor imputed an income of 6 per cent to the remainder, but it is not at all clear that actual anticipated income less expenses will approximate such imputed income. Moreover, to obtain the present value of the imputed income, the assessor capitalized the income at a rate of 8 per cent. The capitalization rate is supposed to reflect risk and interest attributable to the particular investment to which it is applied (see 1 Bonbright, The Valuation of Property, pp. 259-264), but the assessor's rate appears to measure, not the risk and interest attributable to the investment at bar, but that attributable to an income hypothetically imputed to a "base value." In summation, the assessor's valuation of the leaseholds is predicated on the assumption that a certain percentage of an amount somewhat less than the fee value, when capitalized at an abstractly reasonable rate, equals the value of the possessory interest. In some cases this assumption may have to be made, and we do not condemn all estimates of value based on capitalization of an imputed income. In valuing property wherein actual income is derived in large part from enterprise activity and cannot be ascribed entirely to the use of the property, an imputed income analysis may be both useful and appropriate. In the present actions, however, the income from the possessory interests will be from subrentals and can be ascribed entirely to the possessory estates. Moreover, future income can be expected to remain stable, for rents are controlled in amount by the Federal Housing Administration and the Department of the Navy and occupancy is assured by the fact that the project is located on a military installation that is "deemed to be a permanent part of the Military Establishment." (12 U.S.C.A. § 1748b(b)(2).) Expected annual expenditures have been estimated by both the Federal Housing Administration and the lessees and therefore carefully formulated evidence as to anticipated expenses is available to the assessing authorities. Under these circumstances, the value of plaintiff's possessory interests can best be estimated in terms of actual income rather than imputed income. (See *Pullman Co.* v. *Richardson,* 185 Cal. 484, 496 [197 P. 346]; *Alpaugh Irr. Dist.* v. *County of Kern,* 113 Cal. App.2d 286, 293 [248 P.2d 117]; *Birch* v. *County of Orange,* 59 Cal.App. 133, 138 [210 P. 57]; *H. & W. Pierce, Inc.* v.

*County of Santa Barbara,* 40 Cal.App. 302, 306 [180 P. 641] ; *Wild Goose C. Club* v. *County of Butte,* 60 Cal.App. 339, 341 [212 P. 711].)

Although the trial court employed methods of actual income analysis both in its findings and in its order of remand, we have concluded that both of the court's methods are improper for estimating the "full cash value" of possessory estates. In its findings the court deducted annual "burdens," including payments of principal and interest on the mortgage debts, from annual "benefits," and thereby computed a value that was inversely proportional to the size of mortgage debt payments. Since deduction of "credits secured by mortgage or trust deed" is contrary to section 1 of article XIII of the California Constitution and to well established decisions of this court (*Lick* v. *Austin,* 43 Cal. 590, 594; *Eisley* v. *Mohan,* 31 Cal.2d 637, 643 [192 P.2d 5] ; *cf. Henne* v. *Los Angeles County,* 129 Cal. 297, 298 [61 P. 1081] [decided before repeal in 1910 of former section 4 of article XIII), the method is erroneous. Moreover, in stating that net "burdens" have a present value, the court assumed that annual losses expected to be sustained in future years have a present value in the same sense as money to be received in regular future installments, and it also assumed that such present value may be used in valuing possessory interests for purposes of taxation. Although the assumption that future losses have a present value could rest on the theory that a sum of money invested at present to provide for the payment of expected losses might be termed their present value, a property valuation computed in the manner illustrated by the court's findings and resting on the court's assumptions would in effect alter the property tax from a levy on the present value of property to a tax on the net worth of the individual taxpayer. Plaintiffs, however, do not rely on the method used in the court's findings, but contend that the method outlined in the order of remand is controlling. According to this method, the present lessee's anticipated annual charges to operating expenses, taxes, rent, and amortization of money invested in the leasehold together with interest thereon are deducted from anticipated annual gross income. The difference, when capitalized and reduced to the "proper" ratio of assessment to market values, is deemed the value of the possessory interest. The error of this method is that deduction of amortization does not conform either to the statutory standard of value or to the accepted principles of capitalization heretofore discussed.

The proceedings must be remanded to the county board of equalization for determination of the value of the possessory interests and the taxes thereon. (*Universal Consol. Oil Co.* v. *Byram,* 25 Cal.2d 353, 362-363 [153 P.2d 746].) The board shall take evidence on annual anticipated gross income, operating and maintenance expenses, the amount required to be deposited in the replacement reserve, and the percentage that will adquately allow for taxes. Moreover, since the rate of capitalization is predicated on the risk, interest, and provisions for replacement of capital relative to the investment to which it is applied (see 1 Bonbright, op. cit. *supra,* pp. 259-262), the board shall take evidence on these matters and ascertain therefrom the proper rate of capitalization. It shall deduct annual operating and maintenance expenses and the deposit to the replacement reserve from annual gross income, and shall capitalize the difference at the rate that it determines will allow for risk, interest, and taxes. The period of capitalization shall be the remaining years of the lease, for although the government is authorized to terminate the leases at the end of 50 years, the terms of the leases and the statute under which they were drawn (see especially 12 U.S.C.A. § 1748b (b)(2)) clearly contemplate that the leases will exist for their full terms. (*Kaiser Co.* v. *Reid,* 30 Cal.2d 610, 620 [184 P.2d 879].)

The judgments and orders are reversed with directions to the trial court to remand the proceedings to the county board of equalization for action in accord with this opinion. Each party shall bear its own costs on appeal.

Gibson, C. J., Shenk, J., Edmonds, J., Carter, J., Schauer, J., and Spence, J., concurred.

Respondents' petition for a rehearing was denied December 21, 1955.